# FRANCIS SURVIS v. A. Y. McDONALD MANUFACTURING COMPANY AND ANOTHER.[1]

August 8, 1947.

No. 34,389.

[1]Reported in 28 N. W. (2d) 720.

*M. E. Culhane* and *A. E. Bryngelson,* for appellants.
*Drake & Drake,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order denying defendants' alternative motion for judgment or a new trial.

For some time prior to the commencement of the controversy which culminated in the present litigation, plaintiff was engaged in business as a plumbing, heating, and tinning contractor at St. James, Minnesota, under the name "Survis Tin Shop." During this period, defendant A. Y. McDonald Manufacturing Company (hereinafter called McDonald) manufactured and distributed plumbing,

heating, and tinning equipment and supplies. Defendant S. P. Adams was its credit manager. On September 16, 1942, Adams executed a criminal complaint charging that plaintiff, on or about November 24, 1941, had violated M. S. A. § 514.02, which provides:

"Any contractor or subcontractor on any improvement to real estate within the meaning of section 514.01, who, with intent to defraud, shall use the proceeds of any payment made to him on account of such improvement by the owner of such real estate or person having any improvement made, for any other purpose than the payment for labor, skill, material, and machinery contributed to such improvement, while any such labor performed, or skill, material, or machinery furnished for such improvement at the time of such payment remains unpaid for, shall be guilty of larceny of the proceeds of such payment so used."

The acts specified as a violation of this criminal statute were that plaintiff had obtained a "Kewanee boiler and fittings" from McDonald and installed it in the premises owned by the Uleberg Company, and that, having collected, he failed to remit to McDonald the purchase price of this equipment. A warrant issued on this complaint. Plaintiff was arrested in California and extradited to Minnesota. At the preliminary hearing, plaintiff consented to be and was bound over to the district court. While the proceeding was pending in the district court of Watonwan county, it was dismissed upon the motion of the county attorney. Thereafter, plaintiff instituted the present action against defendants, claiming damages for malicious prosecution. A trial by jury in Hennepin county resulted in a verdict of $4,000 for plaintiff against both defendants.

Before considering the assignments of error, it will be necessary to examine in some detail the course of dealing which transpired between McDonald and plaintiff during the years preceding the period now critical and the events which caused defendants to institute the criminal action.

Plaintiff, in explaining the development of his business relations with McDonald during the years following 1935, testified:

"Q. How did you get goods during 1935?

"A. I sent in cash with orders on the start and then it was sent C. O. D. One day the freight depot called me up and said there was a bill of lading with no invoice attached and if I wanted to pay the freight and take it, it was all right, so I paid the freight and took the shipment home. Before any other shipments came through, Mr. Koppi told me that the company had given me a credit account which continued to December 8, 1941.

"Q. Well, after that how did your goods come with reference to being C. O. D., or with reference to any requirement that you pay for them on delivery?

"A. They came with terms, figure 2% the tenth of the following month and that carried through all of the time that I dealt with the company up to, and including the last shipment, about December 8, 1941. McDonald Company did not at any time from 1935 to 1941, so far as I know, make any inquiry as to the financial standing of any person with whom I was doing business. I believe they made an inquiry as to the financial standing of Mr. Bishop.

"Q. Mr. Survis, at any time that you were doing business with the McDonald Company, did the company file a lien, or attempt to file a lien in connection with any work done by you?

"A. No, sir.

"Q. Was there ever any conversation or suggestion on their part that they reserved any rights to file liens?

"A. No, sir."

The testimony of Adams accords with that of plaintiff on this point, except that he claims that McDonald did on occasion check the credit of persons for whom the materials were to be installed by Survis.

There is some conflict in the evidence with respect to the manner in which orders were handled and accounts maintained. It was agreed that plaintiff, in ordering materials sold directly from his place of business for minor repairs and the like, did not specify the purpose for which such materials were to be used. However, the testimony on behalf of defendants was to the effect that all mate-

rials supplied for the improvement of specific real estate were sold by McDonald to plaintiff in response to orders designating the job on which the materials were to be used; that the numbered invoices for the material sent by McDonald to plaintiff named the real estate to be improved; and that remittances made by plaintiff to McDonald also identified the source of the funds remitted and the particular items to be paid. Plaintiff, on the other hand, while apparently conceding that records were frequently maintained in such manner as to indicate the "job" where the supplied materials were to be used, testified that the practice was not an invariable one and, insofar as followed by him, was for personal convenience. He testified: "It was my privilege to specify the payment of the job or invoice, if I wished to. I didn't always do it." The following also appears:

"Q. Will you explain in what manner you found it convenient to have the name of the owner on the invoice?

"A. Because I bought things that were almost similar, yet were not similar, for different jobs, and in order to reorder for breakage and to keep my own records of who got what, I put those names and wanted those names written in there.

"Q. I think you have testified that there never was any requirement on the part of the company that you furnished them with the name of the owner?

"A. That is right."

Again plaintiff testified: "The designation on orders was for my own information, not because the company required it. They could ask me, and I would give it to them. On a few occasions they did."

McDonald maintained at its office in Minneapolis ledger accounts summarizing the transactions which occurred between it and plaintiff. These ledger cards, which were an important item of evidence in the case, bear the general caption "F SURVIS TIN SHOP ST JAMES MINN." The ledger sheet is divided into nine columns. One of these columns is captioned "DATE," another, "DESCRIPTION," a third, "CHARGES," a fourth, "CREDITS," and a fifth, "BALANCE." The ledger cards contained in the printed record cover the period from August 7, 1939, to December 10, 1942. Under the caption "DESCRIPTION," a

variety of types of notations appear. Illustrative is the following description: "15320 2% E PERRIER." The number apparently refers to the number of the invoice, with the notation "2%" referring to the discount allowed if paid before the tenth of the month, and the name indicating the property owner whose property was to be improved with the materials supplied. Under the caption "BALANCE," the total amount of unpaid charges is carried. Where payments are inserted under the caption "CREDITS," the balance is reduced by the amount of the credit. It does not appear from the ledger sheet that separate accounts are carried for the particular items furnished on a particular job. It does appear from the sheets that the F. Survis Tin Shop is given a rating, presumably for credit purposes. The letter "M" appears following the caption "RATING" on two of the ledger sheets. The last entry appearing on the ledger sheets carries under the caption "DESCRIPTION" the following words: "RESERVE LEDGER ACCT #573"; under the caption "CREDITS," the amount "$1,279.51"; and under the caption "BALANCE," ".00." Apparently this entry was made on December 10, 1942. In the lower left-hand column of this ledger sheet are the words written in longhand, "Left for Cal 1/21/42."

In addition to the general ledger, "copies of invoices, statements of remittances and his orders and correspondence" were kept in the office of McDonald.

As previously stated, the specific crime of which plaintiff was charged by defendants related to money paid on account of an installation on the premises of the Uleberg Company, a partnership consisting of A. J. Uleberg and J. C. Ranseen. The ledger sheets, verified by the invoices, show that the following materials were supplied on account of this work, with dates as indicated:

| 9 | 25 | 50451 | 2% | $ 18.38 |
| 9 | 23 | 49824 | 2% | 281.20 |

(It is to be noted that under the caption "DESCRIPTION" the word "Uleberg" is written in longhand with respect to this item.)

| 10 | 7 | 51879 | 2% | 4.91 |
| 10 | 10 | 52597 | 2% | 14.25 |

| 10 | 23 | 54366 | 2% | | 11.66 |
| 10 | 22 | 54326 | 2% | | 1.75 |

A letter dated September 22, 1941, from McDonald to plaintiff, reads as follows:

"I just OK'ed an order for Kewanee boiler to be shipped to you direct and I would like to inquire the name of the job on which this boiler is to be used. These reports must be sent to our general office. Thanking you very much."

In longhand and signed by plaintiff on the bottom of this letter appears this notation: "This Boiler is for the Uleberg Co. Job, St. James." On November 26, 1941, plaintiff wrote McDonald enclosing a check for $250 bearing even date therewith. That letter reads as follows:

"Enclosed find $250.00 to apply on acct.

"Will have more next week when post dated check I received is good."

A check dated December 2, 1941, in the amount of $250, was mailed by plaintiff to McDonald without any letter or indication of the manner in which it was to be applied. Upon receipt of this second check, McDonald wrote plaintiff the following letter dated December 4, 1941:

"This will acknowledge receipt of your check in the amount of $250.00 for which we have placed to the credit of the older portion of your account inasmuch as no comments were received with your check.

"However, we would like to have a remittance covering some of the jobs, such as Bergan, Mrs. John Ask, Uleberg, Olson and others, and will appreciate hearing from you at once relative to the above mentioned jobs."

Both checks were applied by McDonald as payments on account, and, according to the ledger sheets, the "BALANCE" was reduced by the amount of these payments.

Our problem is further complicated by the fact that during approximately the same period as that covering the Uleberg transaction plaintiff obtained from McDonald materials for installation at a number of other places, including those referred to in the letter of December 4, quoted above. Plaintiff collected approximately $1,000 on account of these improvements. It is apparently conceded that he did not remit anything to McDonald from these collections either at or near the time payment was received. There is testimony in the record that the two $250 checks were paid out of the proceeds of the "Uleberg job" collection. There is no testimony to the contrary. Adams testified:

"Q. I want to ask you this question. If you had known at that time that the money used to pay those checks was the Uleberg money, would you have applied the same method that you did in the Koeder case that you have just told us about of paying as you did in the Koeder case the Uleberg bill in full of $332.15, and applying the balance on the account?

"A. Yes."

During January 1942, according to the testimony of Adams, letters were written to plaintiff in an effort to persuade him to reduce his indebtedness. One, dated January 14, 1942, states in part: "Your account as of December 31 is $1,354.41 and our General Office is becoming quite concerned regarding this amount." In February 1942, Adams ascertained that plaintiff had gone to Vallejo, California, and, subsequently, that his wife had joined him there. About March 1, Adams placed the account in the hands of his attorney, M. E. Culhane, of Minneapolis, for collection. Culhane, after investigating and learning that plaintiff had made a number of collections before going to California and that he had not remitted except as stated above, referred the matter to the firm of O'Hara & Randall, attorneys at Vallejo, California. On March 30, 1942, Culhane wrote to these attorneys, enclosing an "itemized statement of the account, showing a balance without interest of $1,354.51. The account draws interest 30 days after the date of each invoice." The criminal statute

involved in this case was set out verbatim in the letter, and attention was directed to the case of State v. Harris, 134 Minn. 35, 158 N. W. 829, construing the statute. After referring to the fact that plaintiff's wife, Lulu H. Fall Survis, "owns the residence property occupied by these parties at St. James, Minnesota," Culhane stated in the letter:

"It would seem to the writer that both Mr. and Mrs. Survis would be very desirous of settling with my client. No doubt, Mr. Survis is familiar with the criminal statute that I have herebefore quoted."

The letter concluded with the request that "some experienced man from your office" should call personally on Mr. and Mrs. Survis, because "it might be that the mortgage and promissory note could be obtained at that time."

The record contains a deposition of Ellis R. Randall, a member of the California law firm, in which Randall stated that he first met plaintiff on April 27, 1942. Referring to the conversation which took place at the Survis home in Vallejo, Randall deposed:

"* * * I stated that I had received two letters from a Mr. Culhane who was representing McDonald Mfg. Co. in Minnesota and asked him if he was indebted to the company. He stated that he was indebted and I asked him what his intentions were toward the obligation. He said he wanted to pay the same as soon as he was able. I asked him to read the two letters from Mr. Culhane which I had in my possession, which he did. I then requested him to communicate directly with Mr. Culhane or make arrangements to pay his debt to the company and in this way get our law firm out of the picture. * * * I asked him if he would be interested in securing the claim by having Mrs. Survis execute a mortgage on her property in St. James, Minnesota, in accordance with the suggestion offered by Mr. Culhane in one of his letters. Mr. Survis stated that he would not ask Mrs. Survis to do this."

On that same day, plaintiff wrote to N. Mathias, McDonald's branch manager, stating in part:

"* * * I am enclosing a check to apply on the acct and you can expect one every month from now on until it is paid in full.

"I shall mail them direct to the McDonald Co. as this attorney does not want payments and that is all I can make for if I had the amount I owe you I would send it.

"I think the past association I have had with your company is proof enough that I am not trying to defraud as the attorney tried to make it sound, and I dislike that very much.

"You see Mr Mathias, my wife had to have an operation, and the Mayo Clinic said it had to be very shortly or cancer would set in and it would be too late. Thats where the money went, and the way this war was going this job was the only logical place for me to make money to pay my bills which I intend to do and hope to save a little to start up in business again when it is over.

"I realized Mr Mathias that the way I left would look bad, but I think if you have had the worries over sickness I had and had to spend your time in Rochester and had a call to take a job while you were there to report at once for it, and took your wife home late in the evening, just out of a hospital and left early next morning for Calif. where it took a week to find out how she was getting along, I believe you would understand the state of mind one is in."

Other evidence adduced during the course of the trial supports the statement made by plaintiff in this letter that his wife had undergone an operation at the Mayo Clinic and that the money which he had collected during the latter part of 1941 was used for extraordinary expenses caused by this misfortune. As to the reference in this letter to a check which was being enclosed and others which were to be forwarded, the record shows that checks in the following amounts, with dates as indicated, were sent by plaintiff to McDonald: April 27, 1942, $35; June 3, 1942, $40; August 6, 1942, $50; September 16, 1942, $50.

On July 23, 1942, Culhane wrote a letter to Elmer M. Perrier, then county attorney of Watonwan county, in which he stated in part as follows:

"* * * As I understand it, it is a violation of our criminal statute for a contractor to fail to pay for material obtained for jobs in this way, regardless of whether or not any mechanics liens are filed.

"What I would like to know is, what you will require from A. Y. McDonald Mfg. Company, in connection with your instituting criminal proceedings against Mr. Survis? I am assuming that if the facts are, as I am stating them to you, that there has been a clear violation of the criminal statute."

On July 25, 1942, Perrier answered Culhane's letter in part as follows:

"* * * If we are to institute criminal prosecution in this matter, I would suggest that one of the representatives of the A. Y. McDonald Mfg. Co. come to my office supplied with full and complete information on one or more of the various jobs Survis collected upon."

Culhane communicated with O'Hara & Randall at Vallejo, who wrote to plaintiff in part as follows:

"* * * Apparently, the company is not satisfied with the arrangement you made and the two payments of $35 each. A criminal action is being seriously considered and since it is a felony, you could, of course, be extradited to Minnesota."

Following receipt of this letter, Mr. and Mrs. Survis went to the office of O'Hara & Randall and discussed the matter with a Mr. Castagnetto of that firm. "He asked what we were going to do about paying and we told him we were paying as fast as we could; that we had sent in one payment of $35.00, one $40.00 check and one $50.00 check."

After correspondence between Culhane and the county attorney with reference to arrangements for an appointment for Mr. Adams to consult the county attorney regarding this problem, Adams met with Perrier on September 16, 1942. He testified that he showed the county attorney McDonald's records and files pertaining to the Uleberg, Harms, Ask, Tillisch, Olson, Haugen, and Bergan jobs, these being the specific improvements made by plaintiff with ma-

terials obtained from McDonald during the latter part of 1941. The records and files included ledger cards, remittance statements, orders, and invoices on such jobs; also the letter from plaintiff dated November 26, 1941, to McDonald enclosing the first $250 check and directing that it be credited to his account, together with a copy of the letter from McDonald to plaintiff, dated December 4, 1941, informing plaintiff that the second check for $250 had been applied on the older portion of his account and inquiring about the Uleberg and other jobs. In addition, Adams exhibited to Perrier a letter from Culhane to McDonald dated March 4, 1942, in which Culhane stated that he had ascertained that plaintiff had collected $558.70 from the Uleberg Company on November 24, 1941; $191 from Philip Haugen; $54.50 from Mrs. John Ask; and $167.56 from Fred Harms. Adams testified that he explained to the county attorney how materials were sold and earmarked for specific projects. He claims that he told the county attorney that plaintiff had collected for all of these materials, but had failed to pay McDonald the money owed it. Adams testified that the county attorney advised him at that time that plaintiff had committed a crime when he used the proceeds of the payment for the improvement of the real estate of the Uleberg Company and other jobs at a time when McDonald had not been paid for the material contributed. Finally, he testified in this regard that the county attorney had prepared the criminal complaint before a justice of the peace and advised Adams to sign it, which he did. It was under the warrant issued on this day that plaintiff was arrested, and it is out of this arrest that the present controversy arises.

By appropriate assignments of error, defendants contend that their motion for judgment notwithstanding the verdict should have been granted, because (1) the evidence shows conclusively that the dismissal of the criminal proceedings was brought about by the procurement of the attorney for plaintiff; (2) that plaintiff was as a matter of law guilty of the crime charged; (3) that even though plaintiff was not guilty recovery should not be permitted against defendants because of the evidence showing that they relied upon

the advice of the county attorney of Watonwan county and M. E. Culhane, attorney for McDonald, in causing the criminal proceedings to be instituted; (4) that the evidence shows that defendants had probable cause for instituting the criminal proceedings; and (5) that a stipulation entered into between an attorney for plaintiff and the county attorney of Watonwan county at the time of the preliminary hearing constituted prima facie evidence of probable cause. Further, defendants argue that a new trial should be granted because of certain assigned errors in the instructions given and refused by the trial court.

■ Defendants argue that the present action cannot be maintained, because the dismissal of the criminal action was brought about by the procurement of plaintiff and plaintiff's attorney.

An action for malicious prosecution will not lie until the prosecution has terminated in favor of the accused. 4 Dunnell, Dig. & Supp. § 5727. Where the termination of prosecution has been brought about by the procurement of the accused, an action for malicious prosecution cannot be maintained. Nelson v. National Cas. Co. 179 Minn. 53, 228 N. W. 437, 67 A. L. R. 509. In Jaffe v. Stone, 18 Cal. (2d) 146, 152, 114 P. (2d) 335, 339, 135 A. L. R. 775, this rather clear statement was made:

"* * * The other and reverse rule is that, where the proceeding has been terminated without regard to its merits or propriety by agreement or settlement of the parties, or solely by the procurement of the accused as a matter of favor, or as the result of some act, trick, or device preventing action and consideration by the court, there is no such termination as may be availed of for the purpose of such an action."

See, also, Restatement, Torts, § 660. The record shows that an attorney, acting for plaintiff, brought numerous pertinent facts to the attention of the county attorney and conferred with the county attorney and district judge relative to the criminal prosecution. However, there is no conclusive evidence that plaintiff's attorney induced or caused the dismissal of the criminal prosecution, and

there is no evidence whatsoever of any improper measures having been taken to produce such a result. Under the circumstances, the trial court could do no more than submit this issue to the jury, which was done. In our opinion, the issue was decided by the jury's verdict in favor of plaintiff.

■ If plaintiff was actually guilty of the crime charged, he cannot prevail in a civil action for malicious prosecution. 4 Dunnell, Dig. & Supp. § 5739; Price v. M. D. & W. Ry. Co. 130 Minn. 229, 153 N. W. 532, Ann. Cas. 1916C, 267. Defendants argue that "when plaintiff remitted the two $250 checks, even though paid from the proceeds collected for the Uleberg Co. improvement, and although paid to McDonald, but without knowledge on its part of the source of the same, was to the extent of the amount of the Uleberg Co. material, $332.15, using such proceeds for a purpose other than paying for such material and constituted larceny." And again, "Although plaintiff remitted to McDonald the proceeds of the payments made on the Uleberg improvement, he violated the law because he applied the same to his account and not to the payments of material. In other words, plaintiff applied such payments to a purpose other than the payments for material while the material remained unpaid for." In support of this contention, defendants cite a number of cases where converted funds were applied to the payment of an account of the wrongdoer. See, State v. Glaze, 177 Iowa 457, 159 N. W. 260; People v. Forman, 67 Cal. App. 693, 228 P. 378; State v. Dubois, 98 Utah 234, 98 P. (2d) 354; People v. Donohue, 369 Ill. 558, 17 N. E. (2d) 21; Commonwealth v. Hackney, 117 Pa. Super. 519, 178 A. 417; Watson v. State, 158 Tenn. 212, 12 S. W. (2d) 375; Dupuy v. State, 135 Tex. Cr. 595, 121 S. W. (2d) 1003; State v. Baumhager, 28 Minn. 226, 9 N. W. 704; State v. Dahlstrom, 162 Minn. 76, 202 N. W. 51.

For a full understanding of the statute in question, Meyer v. Berlandi, 39 Minn. 438, 40 N. W. 513, 1 L. R. A. 777, 12 A. S. R. 663, should be examined. In that case, certain portions of G. L. 1887, c. 170, including § 3, making it a felony punishable by imprisonment in the penitentiary for a contractor who has received his pay

from the owner to fail to pay his laborers and materialmen (although he may not be guilty of any fraud), were held unconstitutional. Mr. Justice Mitchell there stated (39 Minn. 441, 40 N. W. 514) :

"Section 3, if not unconstitutional on other grounds, is clearly repugnant to section 12, art. 1, of the constitution of the state, prohibiting imprisonment for debt. It is not necessary that a contractor be guilty of any fraud or other tort in order to subject him to the penalties of this section. If he has received his pay from the owner of the property, and owes a debt due on contract to one of his laborers or materialmen which he is unable to pay, he is guilty of obtaining money on false pretences, and liable to imprisonment in the penitentiary. No matter how honestly he may have paid over the last dollar which he has received on his contract, yet if, through honest mistake, he took the job too cheap, or if by unforeseen accident it cost more than he anticipated, and for that reason he cannot pay all that he owes for labor or material, he is a felon. This is returning with a vengeance to the old barbarous fiction upon which imprisonment for debt was originally based, viz., that a man who owed a debt, and did not pay it, was a trespasser against the peace and dignity of the crown, and for this supposititious crime was liable to arrest and imprisonment. Such a statute cannot be sustained for a moment."

The statute now under consideration (§ 514.02) differs from G. L. 1887, c. 170, § 3, in that by the terms of § 514.02 an "intent to defraud" is now required. This statute was held constitutional in State v. Harris, 134 Minn. 35, 38, 158 N. W. 829, 830, the court saying:

"We are cited to the decision in Meyer v. Berlandi, 39 Minn. 438, 40 N. W. 513, 1 L. R. A. 777, 12 Am. St. 663, as being conclusive against the state in the case at bar. When, however, that case is examined, it will be found to sustain the legislation here in question, rather than to overturn it. The 'intent to defraud' which is the gist of the act of 1915 was not contained in the act there under consider-

ation, and it is the 'intent to defraud' which makes unlawful and criminal the acts prohibited by the statute."

The enforcement of this criminal statute is therefore extremely difficult, because the difference between the proper and the improper application of its provisions depends entirely upon the state of mind with which the defendant proceeded at the time of the visible acts giving rise to the criminal prosecution.

Defendants argue that we are free to presume fraudulent intent from the commission of unlawful acts. See, State v. Kortgaard, 62 Minn. 7, 64 N. W. 51; State v. Hokenson, 211 Minn. 70, 300 N. W. 193; State v. Dahlstrom, 162 Minn. 76, 202 N. W. 51. If by this defendants propose that a conclusive presumption of a fraudulent intent follows from the failure of a contractor to pay a debt, we must emphatically disagree, because under such circumstances the difference between the 1887 statute, declared unconstitutional, and the 1915 statute (§ 514.02), saved from invalidity because of the requirement of fraudulent intent, would be one of form only. We will agree, for the sake of argument, that under the circumstances disclosed by the record in this case the failure of the contractor to pay the materialman, coupled with other circumstances, was sufficient to make a fact question for the jury on the question of whether the intent of plaintiff was "fraudulent" when he failed to instruct McDonald to apply the proceeds of the Uleberg job transmitted to that company in payment of the specific charges carried on their books on account of the material furnished on those jobs. This issue, however, was submitted to the jury by the trial court under proper instructions and was decided in favor of plaintiff. Under these circumstances, we cannot hold as a matter of law that the failure of plaintiff to pay the debt owed by him was felonious.

■ Defendants also urge that the evidence establishes as a matter of law that they acted in good faith in reliance upon advice of counsel.

"It is a well established rule in this state that where a person states fully and fairly to an attorney all the facts known to him and

is advised that such facts warrant a criminal prosecution, and, acting in good faith in reliance on such advice, he institutes a prosecution, he has a complete defense to an action for malicious prosecution." Miller v. American Nat. Bank, 216 Minn. 19, 23, 11 N. W. (2d) 655, 657.

See, also, Jones v. Flaherty, 139 Minn. 97, 165 N. W. 963; Mundal v. M. & St. L. R. Co. 92 Minn. 26, 99 N. W. 273, 100 N. W. 363; Kasal v. Picha, 156 Minn. 446, 195 N. W. 280; Restatement, Torts, § 666.

Proceeding further, defendants argue that prior to the time Adams signed the criminal complaint he exhibited to and discussed with the county attorney of Watonwan county the written data upon which the subsequent opinion of the county attorney was based. This written data included ledger cards, invoices, remittance statements, and orders from plaintiff to McDonald, not only on the so-called "Uleberg job," but on other jobs of a similar nature. The county attorney was informed of the receipt of two payments subsequent to September 5, 1940, in the amount of $250 each, and that plaintiff had been directed to apply the first of these payments "on account" and had received no instructions as to the second payment. The county attorney prepared the criminal complaint and asked Adams to sign it before the justice of the peace, who came to the office of the county attorney. On the other hand, the county attorney, admitting that Adams had exhibited to him the records above described, claimed that Adams had failed to give him certain other relevant information of which Adams knew or should have known. The record discloses this testimony:

"Q. Well, what have you in mind when you say that you did not receive full information?

"A. Well, in the first place, these ledger sheets were submitted and they were explained to me by Mr. Adams. He is the credit man. I am not familiar with the system of bookkeeping they have but as I recall, his explanation, there was a system of business being conducted between Mr. Survis and the McDonald Company whereby on each job if there was a specific charge for a certain job, there would

be a specific credit, and that was one of the impressions that I was under prior to the issuance of the paper. Another impression that I was under is that that money had been collected by Survis and had never been remitted by him. I later discovered what appeared to me to be nearly an open account existing between the parties.

"Q. Now, isn't it a fact, Mr. Perrier, that at that time when you computed the amount in the complaint, you at that time of course knew that the jobs on these particular properties had been paid for, did you not?

"A. You mean, that this Uleberg job had been paid?

"Q. Yes.

"A. No.

\* \* \* \* \*

"Q. Well, do you think—was it your construction of the law then that where there was an open account this law didn't apply?

"A. Yes, I believe that's true, if a person buys on open account and that it was a condition that existed over a period of time.

\* \* \* \* \*

"Q. No, and as a matter of fact, in all fairness to the defense here and to all parties concerned, you know now and you knew then, did you not, that the A. Y. McDonald Company and Mr. Adams did not know that the $250.00 which they received on that day came from the Uleberg payment to Survis, did they?

"A. The only thing I know is that they told me that Survis collected the money on the Uleberg job and didn't remit it to the McDonald Company. That's the information that they gave me."

From this testimony and from the evidence considered as a whole, a jury issue was raised on the question of whether Adams exercised due diligence in discovering the source of the two payments of $250 which he received from plaintiff from the proceeds of the Uleberg job. The record shows that the total amount charged against plaintiff by McDonald during the period from January 1, 1939, to December 1941, for miscellaneous tinning and heating supplies sold by plaintiff to users and not installed by him amounted to $439.43. It should therefore have been evident to Adams that the payment was

to be applied to something other than these miscellaneous items. Before relying upon an opinion of the county attorney, he should have disclosed this circumstance to the county attorney and should have ascertained himself or put the county attorney upon notice of the necessity of ascertaining the exact source of the $500 payments. In Restatement, Torts, § 662, under *comment i,* this statement is made:

"Circumstances known or believed by the accuser may be incriminating to the accused and yet may not so clearly indicate guilt that a reasonable man would initiate criminal proceedings without investigation. In determining whether an investigation should be made, the following factors are important; * * * the existence of a ready opportunity to obtain an explanation from the person accused * * *."

Further, it appears that Adams induced the county attorney to believe that some form of practice had developed between McDonald and plaintiff whereby separate accounts were maintained for materials furnished for specific enterprises. The records are so confusing that it is difficult to ascertain just what type of accounting system was maintained as between them. The ultimate conclusion reached by the county attorney, after conferring with plaintiff and his attorney, that the goods were sold on open account, is not without merit, and it is reasonable to conclude that had Adams made the complete and accurate disclosure which would be expected from the credit manager of McDonald the county attorney would not have given the advice which he did give.

The same considerations can be said to apply to the advice which was received by defendants from their own attorney, M. E. Culhane. In addition, the jury was free to consider the fact that the course of dealing between McDonald and plaintiff immediately before and even after the criminal prosecution was instituted may well have indicated that McDonald, in seeking advice from Culhane, was endeavoring to ascertain, not so much whether a criminal statute had been violated, as the lengths to which it could go to collect its ac-

count without hazarding a subsequent action for malicious prosecution. See, Restatement, Torts, § 668, *comment h*. This being the case, the jury was free to conclude that there was neither full disclosure on the part of defendants nor good-faith reliance upon the opinions received. The fact that Mr. Culhane's files relative to the case had been lost or destroyed was a handicap to a full presentation of the facts.

■ The trial court submitted the issue of probable cause to the jury. In its charge the court defined "probable cause" and stated that the prosecutors were chargeable with knowledge of all facts which would have been disclosed by reasonable investigation. It also called the jury's attention to the dispute between the parties as to their way of doing business, outlining the contention of plaintiff to the effect that the goods were shipped to him on open account, as contrasted with the claim of defendants that items such as "heating plants, boilers, and so forth, installed in people's homes and business places, were handled separately on their books, and as money was received by plaintiff and sent to the defendant it was applied on either the open account or to these special accounts as indicated as to where it came from." The court also reviewed for the jury the position of defendants, to the effect that "when they were informed that plaintiff had collected on the various special jobs then pending and they believed that he had not paid them any of this money for the material, and that plaintiff had gone to California, that they honestly and with probable cause believed that plaintiff had violated the statute above referred to." With these general instructions, the trial court left the determination of the issue of probable cause to the jury.

In its memorandum attached to the order denying defendants' motion for judgment notwithstanding the verdict or a new trial, the trial court said:

"The second point this court wishes to mention has to do with the question of the instruction covering probable cause. There is some confusion in the law relative to the correct rule, but it certainly is established that if there is a conflict in the evidence the

matter should be submitted to a jury under proper instructions. * * * By denying this motion for a new trial the court has accepted and approved the finding of the jury. If the case is appealed and the Supreme Court finds as a matter of law or under the evidence that there is no sufficient proof on the question of probable cause, they would have a right to reverse it."

Where the facts are not in dispute, the issue of probable cause should be determined by the trial court. Where the facts are in dispute, they should be submitted to the jury, either (a) for the return of specific findings of fact or (b) for the return of a general verdict in accordance with appropriate instructions and dependent on whether the jury finds one or another version of the facts to be true. Cole v. Curtis, 16 Minn. 161 (182); Burton v. St. P. M. & M. Ry. Co. 33 Minn. 189, 22 N. W. 300; Polzin v. Lischefska, 164 Minn. 260, 204 N. W. 885; Reiherzer v. Bresky, 170 Minn. 266, 212 N. W. 456. Upon appeal to this court, we are required to determine the issue of probable cause rather as a legal conclusion than as a mere question of fact. Thus, in Eastman v. The Leiser Co. 148 Minn. 96, 102, 181 N. W. 109, 112, the principle was stated to be:

"If the facts are undisputed, the question of probable cause is for the court. The inferences to be drawn from any given state of facts are for the court. It is for the court to declare the ultimate conclusion, as to whether facts, either admitted or established by proof, are sufficient to show want of probable cause. In reviewing a nisi prius determination upon a given state of facts as to the existence of probable cause such determination is not treated as a mere conclusion of fact to be sustained if there is evidence reasonably supporting it. It is treated rather as a legal conclusion, and, in reviewing it, an appellate court will measure its correctness by its own judgment from the facts shown, considering the evidence and weighing it as if heard in the court of review, in order to determine the correctness of the determination below."

Defendants argue that in the case at bar the facts as to probable cause were not in dispute; that the facts show probable cause; and

that the trial court should have so determined. Although there may be merit in this argument, we think that the trial court, by adopting the jury's conclusion implicit in its verdict that probable cause was lacking, in effect decided the issue. We treat the case as one where the trial court has found probable cause, and we examine the record to measure the correctness of this determination "from the facts shown, considering the evidence and weighing it as if heard in the court of review." See, also, Moore v. N. P. R. Co. 37 Minn. 147, 33 N. W. 334; Gilbertson v. Fuller, 40 Minn. 413, 42 N. W. 203.

In reviewing the evidence, we have in mind that the essential elements of the statute appear to be as follows: (1) An improvement to real estate by labor or materials; (2) a payment made on account of such improvement to the contractor or subcontractor; (3) use of the proceeds of the payment by the contractor or subcontractor for a purpose other than the payment for labor and materials and failure to pay for such labor and materials; and (4) intent to defraud.

The evidence shows clearly that the real estate of the Uleberg Company was improved by the installation of a Kewanee boiler and fittings supplied by McDonald to plaintiff. The evidence also shows that the Uleberg Company paid plaintiff in full for these improvements. Therefore, there can be no dispute as to the existence of the first two of the above stated elements of the criminal statute under which prosecution was instituted. From the evidence we have before us, it must be concluded that $500 of the money collected by plaintiff on account of the Uleberg "job" was sent by him to McDonald in the form of the checks dated November 26 and December 2. The money was applied by McDonald as a payment on account of the indebtedness owing by plaintiff to McDonald, which included the sum of $332.15 for the materials used in connection with the improvement of the Uleberg real estate. It is our opinion that where, as in this case, the person supplying materials fails to reserve title thereto and maintains accounts in a manner not clearly indicating an intent to treat failure to designate the source of the

funds as a breach of the obligation to make payment of the debt, the third element of the statute above specified is not established.

Apart from the foregoing, we do not feel that there was any reasonable basis for the belief that plaintiff intentionally defrauded defendants. McDonald had seen fit to extend credit to plaintiff, apparently relying on his integrity and good faith. The failure of plaintiff to specify the source of the two $250 checks which he sent to McDonald can hardly be attributed to an intent to defraud McDonald of the money which he was sending to him in the form of checks. It appears that, although plaintiff went to California while indebted to McDonald in the amount of $1,354.51 without notifying defendants of his intention to do so, the circumstances which caused him to do so were adequately explained in plaintiff's letter to McDonald of April 27, 1942, in which he recited the misfortunes he was having and which had made it necessary for him to go to California to find employment in a defense plant. Prior to the time the criminal process issued, plaintiff had on several occasions acknowledged his indebtedness to McDonald and had made an apparent good-faith effort to reduce the indebtedness by periodic payments. It is our opinion that if McDonald had taken appropriate steps to investigate the facts before signing the criminal complaint it would have been discovered that the proceeds received on account of the improvements to the Uleberg real estate had in fact been paid to defendants. Apart from this, we do not find sufficient evidence of any intent to defraud on the part of plaintiff to justify the institution of criminal proceedings. We therefore hold that under the circumstances of this case defendants did not have probable cause for instituting the criminal prosecution.

■ At the time set for the preliminary hearing, a stipulation for continuance was entered into between the county attorney and the attorney who defended plaintiff in the criminal proceeding. It provided:

"* * * that the defendant be bound to the next term of the District Court of Watonwan County, Minnesota, to be held April 12,

1943, but that the defendant reserve the right to have a preliminary hearing at any time prior to the next general term of court, and that said preliminary hearing shall have the same force and effect as if had on this date."

No preliminary hearing was had prior to the dismissal of the prosecution in district court. Defendants contend that the consent of plaintiff to be bound over to the district court amounted to an admission on the part of plaintiff that the crime charged in the complaint had been committed and that there was reasonable cause to believe that plaintiff had committed it.

The preliminary examination provided for by statute serves a twofold purpose: (1) It enables a magistrate to ascertain promptly whether there is probable cause or sufficient ground to hold the prisoner for trial; (2) if probable cause is found, the magistrate can fix bail or commit the prisoner for trial. State ex rel. Jeffrey v. Tessmer, 211 Minn. 55, 300 N. W. 7.

While there is some authority to the contrary, it has been held that where the result of the preliminary examination before the magistrate is unfavorable to the accused and he is held or committed by the magistrate, this is prima facie but not conclusive evidence of probable cause. 38 C. J., Malicious Prosecution, § 45. While the waiver of a preliminary examination and the giving of bail for an appearance is not such an admission of guilt as will preclude a party from sustaining an action for malicious prosecution, it raises a prima facie presumption of probable cause for the prosecution, which presumption, however, may be overcome by competent evidence on the trial. 38 C. J., Malicious Prosecution, § 46. In Vansickle v. Brown, 68 Mo. 627, 637, the court said:

"* * * If the finding of the magistrate on the facts proved before him makes a *prima facie* case, surely waiving an examination and voluntarily entering into recognizance amounts to a confession by the accused that there is probable cause."

See, also, 34 Am. Jur., Malicious Prosecution, § 152.

We have examined the stipulation entered into here in light of these authorities and have concluded that it cannot be construed as a conclusive admission of guilt raising a prima facie presumption of probable cause for prosecution. It is, at most, an item of evidence to be considered along with the other factors in the case in determining whether there was in fact probable cause for the prosecution. We have previously determined that the record in this case does not show probable cause for the institution of the prosecution, and this stipulation does not change our views on the subject.

■ We have examined the assignments of error made by defendants with respect to the instructions given and not given by the trial court to the jury. We have concluded that in the light of the evidence and of the instructions as given by the trial court defendants were not thereby prejudiced, and we do not feel that a new trial is warranted. The order of the trial court is affirmed.

Affirmed.

[1]Reported in 28 N. W. (2d) 744.