### STATE v. RICHARD LEO OSGOOD.

123 N. W. (2d) 593.

August 23, 1963—No. 38,572.

*Richard Leo Osgood,* pro se, for appellant.

*Walter F. Mondale,* Attorney General, *Charles E. Houston,* Solicitor General, *William B. Randall,* County Attorney, and *Stephen L. Maxwell,* Assistant County Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

Appeal from an order of the District Court of Ramsey County

denying defendant's petition for a writ of error coram nobis. It is defendant's contention that he was denied constitutional rights to due process in that his conviction was for robbery in the first degree, when his guilt was for robbery in the second degree; and in that he was not properly represented by counsel at all stages of the proceedings.

On July 6, 1954, while represented by counsel selected by his parents, defendant pleaded guilty to an information charging him with robbery in the first degree. After presentence investigation, he was sentenced to the St. Cloud Reformatory for a term of from 5 to 40 years. (He was then 18 years of age, and later, after attaining his majority, was transferred to State Prison at Stillwater where he is now confined.) On July 12, 1961, the present petition for writ of error coram nobis was filed. The hearing thereon was on August 11, 1961, and the order denying such petition was made on August 14, 1961.

Defendant sets forth that after his arrest and before he had an opportunity to retain counsel he was subjected to numerous interrogatories by police officers; that they had then given him written statements containing a recitation of his commission of the robbery which he had then initialed at their request; that at his preliminary hearing he was not represented by counsel; that at the time of his plea of guilty he had conferred with his counsel only a few minutes outside the courtroom, who had then advised him that it was to his best interests to plead guilty to the information, as that would mean only a sentence to the Youth Conservation Commission until he was 21 years of age; and that at no time had such counsel advised him that his plea of guilty would mean a mandatory sentence for him of from 5 to 40 years in prison.

With respect to the degree of the crime, defendant asserts that had his counsel taken additional time to investigate the case he would have discovered that the gun used by defendant in the robbery was defective and inoperative and accordingly should not have allowed defendant to plead guilty to robbery in the first degree.

Prior to being sentenced, defendant was interrogated by the trial court as follows:

"Q   Who suggested that you hold up some place? A   Sam. He just asked me if I wanted to go in on a hold up. I said no.

"Q   Then what did he say? A   He kept talking for another ten minutes and I was in it.

"Q   Who had the pistol?   A   I did.

"Q   Did you have it with you when you were out with your girl that afternoon?   A   No.

"Q   How did you happen to bring it along?   A   It was in the bus depot in a locker. I was target practicing that day. I put it in there when I went to meet my girl.

"Q   Where did you get that gun?   A   From a girl in Minneapolis, Pat White. She gave it to Saba and he gave it to me.

"Q   Did Saba know that you had the gun on you?   A   Yes.

"Q   Did he have a gun?   A   No.

"Q   You said you did not want to hold up this place, but he said he did, is that what happened?   A   They all wanted to go and started calling me chicken and everything, so pretty soon I was in on it with them.

"Q   Where did you park the car?   A   Right around the corner from the place, from Mickey's Diner.

"Q   Did you stay in the car?   A   No. I went in. I used the gun.

"Q   Was it loaded?   A   Yes.

"Q   What kind of a gun was it?   A   32 automatic.

"Q   Was it loaded when you left the bus depot?   A   I had the clip out of it, but the bullets were there with it.

"Q   And the others were in the car?   A   For a while. Saba was sitting in there at the time, inside the Diner. Sam went in and he came back out and I went in. Sam left when I came in.

"Q   Was anybody else with you there?   A   A truck driver and some man.

"Q   What did you do? A   I told her to put the money from the cash register in a cigar box and took their wallets.

"Q   You took the wallets of the customers?   A   Yes.

"Q   How much did you get?   A   About $60.00.

*     *     *     *     *

"Q   What did Richard do while you were holding them up? A   Just sat there in case the guy jumped me. * * *
\* \* \* \* \*
"Q   Why did you decide to hold up this place?   A   He talked me into it. They said they were going to do it anyhow and I asked Saba if he would shoot the guy. He said Yes and I decided to go with him.

"Q   Just to save his life?   A   I guess so.

"Q   How far did you get before you were picked up? A   I gave myself up. They picked up Saba after about a month.

"Q   You decided after Saba was picked up that you better give yourself up?   A   Yes.
\* \* \* \* \*
"By Mr. Frank [assistant county attorney]:
\* \* \* \* \*
"Q   * * * when you got to the vicinity of this place called Mickey's Diner, 338 East 7th Street, was there any talk about holding that place up?   A   Yes.

"Q   Who first brought the subject up?   A   Mrs. Saba.

"Q   What did she say at the time?   A   Said she used to work there and it would be an easy place to get.
\* \* \* \* \*
"Q   Up to that time did anybody know that you had the gun with you?   A   Yes. They all knew.

"Q   Had there been talk about using that gun in the hold up if you were going to take part in one?   A   No, not until about 12:15.

"Q   Did you stop in front of Mickey's Diner or near Mickey's Diner after Mrs. Saba remarked that it would be an easy place?   A   Kept right on going and came back later.
\* \* \* \* \*
"Q   Was there any talk about who was going to handle the gun? A   Yes.

"Q   Who talked about that?   A   Told them I didn't want to. Saba said he would carry it. I said, 'You shoot the guy?' and he said Yes, so I took it.

"Q Your reason for taking the gun was what? A Wouldn't shoot him.

\* \* \* \* \*

"Q What was done with the gun? A I think I took it back home that night.

"Q Do you know where that gun is now? A Minneapolis Police Department.

"Q How did they happen to have it? A They took it from another guy in Minneapolis.

"Q Did you give it to somebody else? A Yes.

"Q What was that man's name? A Richard Levine.

\* \* \* \* \*

"By Mr. Schultz:

"Q You have told the Court that your gun was loaded. Please tell the Court how you load that type of gun. A That's it.

"Q You insert the clip where? A In the bottom of the handle.

"Q Now if you don't insert a bullet into the chamber the gun will not fire, is that correct? A Yes.

"Q Will you tell the Court whether you put a bullet in the chamber ? A You have to cock it first. It wasnt cocked.

"Q Was there a safety on that gun? A Yes.

"Q State whether or not that safety was on? A It was on.

"Q In other words, if the safety is not released and the gun cocked it will not shoot? A That's right.

"Q That was the condition of the gun at the time you went in? A Yes."

With respect to the procedure subsequent to defendant's voluntary surrender on June 14, 1954 (after the arrest of an accomplice), the record reveals that on June 18, 1954, a complaint was signed charging defendant and Richard Saba, Margaret Saba, and Samuel A. Faulk with feloniously having taken from Edna Van Alstine in the city of St. Paul against her will and in fear of immediate injury to her person the sum of $28.15 while they were armed with a loaded pistol; and that on June 19, 1954, defendant and the others named in this complaint appeared without counsel in the municipal court of St. Paul for

a preliminary hearing on the charge described. The municipal court's return to the district court thereon dated and filed June 21, 1954, sets forth the following:

"* * * after examination—having been waived— * * * in due form of law touching the said charge and offense, the said Court did, on the 19 day of June, * * * 1954 Adjudge that said offense has been committed, and that there was probable cause to believe that the said Defendants were guilty thereof, and did hold the said Defendants to answer to the said charge according to law * * * no bail having been fixed * * *. And the said Defendants Thereupon—remanded to the Ramsey County Jail to further answer said charge, * * *."

On June 21, 1954, an information was filed in the office of the clerk of the District Court of Ramsey County by the county attorney charging defendant with robbery in the first degree. On July 6, 1954, defendant was duly arraigned in the district court on the information described. He was then represented by a duly licensed attorney who had been selected by his parents to act as his counsel. The return on this arraignment filed July 7 set forth the following:

"That the said Richard Leo Osgood on the 6th day of July 1954, being duly arraigned, entered a plea of Guilty as charged;

"Whereupon the Court * * * in accordance with said Guilty plea, adjudged the said Richard Leo Osgood guilty of the crime [of] Robbery in the First Degree and on the 6th day of July, 1954, pronounced the following sentence, to-wit:

"It is the sentence of the Court that you be committed to the Youth Conservation Commission of the State of Minnesota according to law."

Previous to such sentence the presentence examination as above set forth took place. It appears that at this time defendant was also represented by another attorney. Judgment effectuating the sentence above described was filed in the office of the clerk of district court on July 7, 1954.

The records of the Department of Corrections reveal that defendant was released on parole from Minnesota State Reformatory at St.

Cloud on June 11, 1959; that while on such parole he was transferred to the Adult Corrections Commission by reason of having reached his 25th birthday; and that he was returned to the State Reformatory on September 23, 1960, by reason of having violated his parole.

The present proceedings in the nature of writ of error coram nobis would limit this court's functions here to a determination whether there has been an error of fact which, if brought to the attention of the court, would have led to a different judgment. State v. Roy, 266 Minn. 6, 122 N. W. (2d) 615; State v. Tellock, 264 Minn. 185, 118 N. W. (2d) 347. While there is nothing here which would seem sufficient to invoke such a writ we nevertheless have chosen to discuss all of defendant's claims herein.

■ We find no merit in defendant's present contention that, because the gun which he carried at the time of the robbery may have been defective, he might have been charged with less than robbery in the first degree. A review of his presentence examination reveals that at the time of the robbery he carried a .32 automatic pistol and had loaded it prior to entering the diner where the robbery took place. In such examination he described how he had prepared it so that all that was necessary to fire it was to release the safety and cock the hammer. He informed the court as to how he and his accomplices had used it in target practice the afternoon preceding the robbery, and made no statement to the court that it had been then defective. He related his fear that if Saba, his accomplice, were to handle it he (Saba) might "shoot the guy" and how this had resulted in his decision to carry the weapon, indicative of his awareness as to the gun's effectiveness at the time of the robbery. After the robbery, he gave it to a Richard Levine from whom it was taken by the Minneapolis Police Department some weeks later. While it is possible that in the interval it may have become defective, defendant's own statements clearly establish that it was operative at the time he carried it in the robbery. It would follow that no serious consideration can be given to defendant's claim with reference thereto.

■ Defendant's next claim is that he was denied due process in that after his voluntary surrender and before counsel had been re-

tained to represent him, he had been questioned by police officers with respect to the robbery and had given them initialed statements which constituted an admission of his guilt; and in that he had been required to appear at a preliminary hearing without counsel. There is no claim or evidence that any duress was used by such police officers in obtaining the incriminating statements, and it does not appear that such statements formed any basis for defendant's subsequent plea, conviction, and sentence. While he was not represented by counsel during this time or at his preliminary hearing on June 19, 1954, there is no claim that he was denied the right to obtain or confer with counsel during such period or that he had not been able to communicate with his parents, who did obtain counsel for him. It does not appear when such counsel was selected by his parents, and there is nothing to show that in the interval between June 19, 1954, when defendant appeared at his preliminary hearing, and July 6, 1954, when he was arraigned, that he had been denied the right to confer with counsel.

While it has been said that an accused has a right of counsel at every stage of the proceedings, we do not understand this to mean that he must be so represented in the investigative processes which usually follow an arrest, or the preliminary hearing required for the purpose of ascertaining whether a crime has been committed and whether there are reasonable grounds for believing that the accused has committed it, particularly where there has been no request for counsel and there has been no duress such as was involved in Spano v. New York, 360 U. S. 315, 79 S. Ct. 1202, 3 L. ed. (2d) 1265. A preliminary hearing is in no sense a trial, and where, as here, there was no examination of the accused and no statements or pleas were made by him at such hearing, there is nothing in the procedure outlined which would constitute a denial of his rights to due process. It should be remembered that these hearings are required not only for the protection of the accused, but also as a process under which the state, in the interests of law enforcement, may determine whether there is probable cause for believing that the accused has committed a crime. State ex rel. Welper v. Rigg, 254 Minn. 10, 93 N. W. (2d) 198; Survis v. McDonald Mfg. Co. 224 Minn. 479, 28 N. W. (2d)

720; State ex rel. Jeffrey v. Tessmer, 211 Minn. 55, 300 N. W. 7. It is also significant that there is no statutory requirement that the accused be represented by counsel at such a hearing.[1]

■ Defendant asserts that his first and only conference with his counsel took place in the corridor outside of the courtroom immediately prior to his arraignment, at which he pleaded guilty; that during such conference, which lasted but a few minutes, he was advised by his counsel to enter a plea of "guilty," since upon such a plea his sentence would be to the Youth Conservation Commission for a term only up until his 21st birthday, about 2 years from that date; and that based upon such advice he did so plead at the arraignment. He asserts further that it was not until some time later that he first learned that his counsel was not experienced in criminal procedure at that time and was unfamiliar with the mandatory penalty of 5 to 40 years for the crime charged; that his counsel had not then sought additional time for study or investigation of the case; and that all of such factors resulted in a denial of substantial rights of defendant under the due process clause of the state and Federal constitutions and resulted in his sentence of from 5 to 40 years, of which 9 years have already been served.

In the present district court proceedings, it is not revealed that any substantial investigation of these claims was made. Defendant did appear personally in court to testify with respect thereto, but there is no indication that counsel was appointed to represent him or that he was accorded any right to subpoena witnesses or to procure a transcript of the proceedings so that any evidence with reference to his

---

[1]Under Minn. St. 629.50 an accused may, if he desires, present witnesses to be sworn and testify on his behalf and he may be assisted therein by counsel in such examination. He is also authorized to cross-examine witnesses in support of the prosecution. There is no requirement that he do these things or that he be represented by counsel. Under § 630.10 the accused must be informed by the court that it is his right to have counsel before arraignment and must be asked if he desires the aid of such counsel. See, State v. Moosbrugger, 263 Minn. 56, 116 N. W. (2d) 68; State ex rel. Adams v. Rigg, 252 Minn. 283, 89 N. W. (2d) 898; State ex rel. Schwanke v. Utecht, 233 Minn. 434, 47 N. W. (2d) 99.

claims might be examined and made available for appeal to this court. Further, it does not appear that any findings with respect thereto were made by the trial court, and the order denying defendant's petition makes no reference to the truth or falsity thereof.

Accordingly, to make certain that defendant was accorded due process at the time of his arraignment, conviction, and sentence; and in the attendant proceedings including his right to adequate time and opportunity to confer with counsel, and adequate time for the latter to investigate the facts and ascertain the law involved, we feel that this case must be remanded for further hearing at which defendant shall appear in person with counsel and be accorded the opportunity to subpoena witnesses including counsel who represented him at the time of his plea and conviction; that he be provided with a transcript of such testimony which shall be available to this court in the event any appeal is undertaken; and that upon such hearing and evidence the court make findings of fact with respect to the issues described.[2]

Remanded for further proceedings in accordance with this opinion.

Mr. Justice Otis took no part in the consideration or decision of this case.

---

[2]The right to counsel cannot be nullified by the appointment of counsel who merely furnishes perfunctory or casual representation. It carries with it the requirement that consultations with counsel be sufficiently adequate to inform the accused of all of his legal rights under the law and facts involved. State ex rel. Dehning v. Rigg, 251 Minn. 120, 86 N. W. (2d) 723; see, also, Townsend v. Sain, 372 U. S. 293, 83 S. Ct. 745, 9 L. ed. (2d) 770; Fay v. Noia, 372 U. S. 391, 83 S. Ct. 822, 9 L. ed. (2d) 837.