IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2012 Session

## STATE OF TENNESSEE v. TERRANCE MEGEL JORDAN

**Appeal from the Criminal Court for Davidson County**
**No. 2008-D-4227    Mark J. Fishburn, Judge**

_____

**No. M2011-00741-CCA-R3-CD - Filed May 8, 2013**

_____

The Defendant, Terrance Megel Jordan, was found guilty by a Davidson County Criminal Court jury of aggravated rape, a Class A felony; rape, a Class B felony; aggravated statutory rape, a Class D felony; and evading arrest, a Class A misdemeanor. *See* T.C.A. §§ 39-13-502 (2010) (aggravated rape), 39-13-503 (2010) (rape), 39-13-506 (2010) (amended 2012) (aggravated statutory rape), 39-16-603 (2010) (evading arrest). The rape and aggravated statutory rape convictions were merged with the aggravated rape conviction, although the trial court later vacated the aggravated statutory rape count. For aggravated rape, he was sentenced as a Range II, multiple offender to thirty-five years, to be served at 100%. For evading arrest, he was sentenced to eleven months and twenty-nine days. The sentences were imposed concurrrently. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions of aggravated rape and rape; (2) the trial court erred in admitting evidence of the victim's statements to a social worker; and (3) the assistant district attorney committed prosecutorial misconduct during the opening statement. We affirm the Defendant's convictions, but we vacate the rape and aggravated rape judgments and remand the case for entry of a single judgment reflecting the merger of these convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Peter D. Heil (on appeal) and Jack L. Byrd (at trial), Nashville, Tennessee, for the appellant, Terrance Megel Jordan.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Sarah N. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the rape by three men of the then-fourteen-year-old female victim. At the trial, the victim testified that she lived in Indiana and that in the summer of 2008, she lived with her grandmother in Nashville. Her cousin, B.K., also lived with her grandmother, and a friend, L., sometimes stayed with them. She said B.K. was about one year older than she was, and L. was younger.

The victim testified that after B.K. received a telephone call from Ezekias Wells on July 30, 2008, B.K. asked the victim and L. if they wanted to "hang out" with Ezekias. She said that after her grandmother went to bed around 11:00 p.m., they left the house through a window, met Ezekias and his brothers Quentin and "Pot" at their house, and went to a swimming pool. She did not know Pot's given name. She said Darnell, another person whose name she did not know, and the Defendant were also at Ezekias's house. She said she had seen the Defendant once before at the house. She said the Defendant was older than the Wells brothers.

The victim testified that they went to the pool about 1:00 a.m. on July 31. She said everyone swam except the Defendant. She said that although she was wearing a bathing suit underneath her clothes, she did not want to get into the pool because she just had her hair styled but that someone pushed her in. She said that they talked about a boy who died in the pool and ghosts and that she was "[s]ort of" scared when they left. She said they went to an adjacent park to dry off. She said that the Defendant and the unidentified man did not go with them to the park and that she did not see them leave or know where they went.

The victim testified that she thought the girls were going home after they left the park but that they went to the Wells' house instead. She said that B.K. and Ezekias wanted to talk and that she waited in front of the house with Quentin and the Defendant. She said that Quentin asked if he could have sex with her and that she refused. She said they told her she was better looking than B.K. and L. She stated that she told B.K. she wanted to go home but that B.K. said she was not finished talking to Ezekias. She said that L. and Darnell were at the side of the house and that B.K. and Ezekias were in the front yard by the car. She said that she walked away from the Defendant and the unidentified man and toward L. and Darnell, that Darnell said, "Man, why you cock-blocking," and that she went to the back of the house. She said that the Defendant stood at the bottom of steps to the deck, that Quentin stood on the deck, and that she stood in the middle of the steps. She said that Quentin asked

-2-

her twice to go inside but that she refused. She stated that Quentin grabbed her arm and took her inside, that she did not want to go but that Quentin pulled her, that Quentin and the Defendant told her to go into the bathroom and show them her panties, and that she refused. She said one of them nudged her shoulder with his hand and made her go into the bathroom, but she did not recall if it was Quentin or the Defendant. She said the Defendant came into the bathroom, closed the door, demanded to see her panties, unbuckled her belt, pulled down her pants, made her bend over the toilet, and penetrated her vagina with his penis. She said the Defendant then turned off the light and masturbated. She said that the Defendant did not ejaculate inside her but that he ejaculated in the toilet. She did not recall if the Defendant locked the door. She said that when the Defendant entered the bathroom, he stood near the door and sink and that she could not have left the bathroom. She stated that she did not want the Defendant to unbuckle her belt but that she did not fight him because she did not want him to hurt her. She said that the Defendant did not physically force her to bend over the toilet but that she did not feel like she could stop him.

The victim testified that she tried to pull up her pants and leave the bathroom but that Quentin entered the bathroom, closed the door, and said, "My turn." She said that he entered the bathroom within about ten seconds of the Defendant's leaving and that she did not have a chance to leave. She said Quentin pulled down her pants and told her to turn around. She said she told him she did not want to have sex. She said he tried to penetrate her but had difficulty achieving an erection and tried to stimulate himself. She said he tried to penetrate her a second time but was unsuccessful. She said Quentin's brother was outside the bathroom and told him to hurry. She said Quentin left without penetrating her. She said she did not fight Quentin or scream because she had seen him hit a girl and knew he had choked her cousin.

The victim testified that she tried again to leave but that Pot entered the bathroom and closed the door. She said the light was still off. She said that Pot asked her to perform oral sex on him but that she refused. She said he sat on the toilet and told her to sit on his lap. She said he penetrated her vagina with his penis. She was unaware of his ejaculating inside her. She said that Pot told her to get up and that she heard B.K. knock on the back door. She said that Quentin told her to go to the front door and then continued to send her back and forth to the two doors. She said that after Quentin let B.K. inside, Pot walked out of the bathroom, she followed, and B.K. said that people make dumb decisions, referring to the victim.

The victim testified that she was scared and did not want to have sex with the Defendant, Quentin, or Pot. She said that after she came out of the bathroom, she did not see the Defendant in the house. She stated that she tried to tell B.K. what happened but that B.K.

would not listen to her and told her they were in trouble because their grandmother was awake.

The victim testified that her grandmother was waiting for them when they arrived home. She said she walked past her grandmother, went to take a shower, and cried. She said that her grandmother came in the bathroom and asked why she had sex with the men and that she told her she did not want to. She said her grandmother contacted some police officers her grandmother had seen walking down the street. She said she told her grandmother that Quentin, Pot, and "a grown man" raped her. She said she had since learned that the grown man was Quentin and Pot's aunt's boyfriend.

The victim testified that the police took her to the hospital and that she talked to a detective and a nurse from Our Kids. She said she was given medication to prevent pregnancy and sexually transmitted diseases and to help her breathe. She said she was shown a photograph lineup of six individuals, from which she identified the Defendant. She said the Defendant had less hair that night than in the photograph. She said she later identified the Defendant in court. She again identified the Defendant as the first person who raped her.

The victim testified that none of the men wore a condom. She was positive she saw the Defendant ejaculate in the toilet. She identified photograph exhibits of the Wells' house, the bathroom and other areas inside the house, and of herself on July 31.

On cross-examination, the victim testified that she had been to the Wells' home several times because her cousin dated one of them and she had dated one of them. She said she had seen the Defendant there once before the rapes. She said that he was in his 20s or 30s and that it was odd for him to go to the pool with them because he was older. She said no one told her the Defendant's age. The victim stated that the Defendant never talked to her at the pool and that the only thing he said to her at the house was that she was cute.

The victim testified that she did not know who pushed her into the bathroom. She agreed she told the nurses at Our Kids that it was Quentin and did not know why she said it. She said she viewed the photograph lineup early in the morning. She thought she did so before she talked to the nurses. She said that when she viewed the lineup, she identified one photograph as "sort of looking like" the grown man but that she could not tell because the person in the photograph had more hair. She said she had since learned that Pot's name was "Cory." She denied telling the police that the Defendant bent her over the sink, not the toilet.

The victim testified that she talked with Pot at the pool and Quentin at the house. She said she never talked to Ezekias. She denied that she liked Ezekias, Quentin, or Cory and did not know why she sneaked out of the house to meet them.

The victim testified that when she went into the bathroom, she was wearing Capri pants and had shorts in her hands. She did not know why she did not testify earlier that she had two sets of clothing with her.

The victim testified that her grandmother was upset with her when she came home. She said she walked past her grandmother to the bathroom, where she left her clothing on the floor. She said that she locked the door and that her grandmother banged on the door and told her to open it. She said that after she opened the door, her grandmother asked her why she had sex with the men, that she told her she did not want to, that her grandmother asked how many people had sex with her, and that she answered. She said B.K. wanted to return to the Wells' house after she heard what happened. She denied that B.K. ever told her B.K. had called the Wells' house afterwards.

On redirect examination, the victim testified that she told the men "no." She said that when she testified she did not like Quentin, Pot, or Ezekias, she meant she did not want to date them, not that she disliked them. She said she had dated one of them previously but was not in a relationship with any of them on July 31. She said that it was possible B.K. was standing near her when she talked to Quentin and the Defendant but that she did not see B.K.

The victim testified that Detective Wiser did not tell her the person who raped her was in the photographs when he showed her the lineup. She said she was pretty sure about the identification because of the difference in the Defendant's hair. She said she "probably" said something to Ezekias during the evening. She said the prosecutor had not asked her if she had two sets of clothing with her. On recross-examination, the victim testified that it was "probably" within the previous month that she dated Ezekias.

Seventeen-year-old B.K., the victim's cousin and best friend, testified that she lived with her grandmother in the summer of 2008. She said the victim and her "play sister," L., also lived there. She said a "play sister" was a friend of the family. She said she knew Ezekias Wells and Quentin Wells from school. She said she knew their brother Pot but had never heard of Corrichardson Wells. She did not know the Defendant. She said they were older than she was.

B.K. testified that on the night in question, the girls sneaked out of the house around 2:00 or 3:00 a.m. and went to the swimming pool. She said they went to the Wells' house first, where they met Quentin, Ezekias, Pot, Darnell, and the Defendant. She said she thought

the Defendant was a friend of the other males and did not know he was their "play uncle." B.K. testified that at the pool, everyone except Darnell and the Defendant swam. She said Ezekias and Quentin talked about a boy who died in the pool and said they saw his ghost. She said they got out and went to a picnic area. She said the Defendant did not go to the park because Ezekias and Pot told him to go home after he was "saying stuff" to the victim and L. She did not hear what the Defendant said to the other girls. She said that at the park, the other males kept talking about ghosts.

B.K. testified that they walked to the Wells' house. She said she talked to Ezekias, the victim talked to Quentin, and L. talked to a person whose name she did not know. She said that the victim and Quentin were at the side of the house and later went to the back of the house. She said that L. and Darnell were on the front porch. She stated that she saw the Defendant come out the back door and say something to Quentin in the victim's presence and that the Defendant returned inside. She said that she did not see the Defendant outside talking to the victim and Quentin after this but that it was possible he was there. She said she and Ezekias walked back and forth from the front and back and then away from the house.

B.K. testified that when they returned to the house ten or fifteen minutes later, the victim was inside. She did not see the Defendant, Quentin, or Pot. She said that she tried to get the victim to come outside and that Quentin kept sending them to different doors. She said she was concerned because a few days earlier when they were at the house, the males were "playing" and would not let them out of the house. She said Quentin opened the front door and said that they were being too loud and that his mother was asleep on the couch. She did not see the victim when Quentin opened the front door. She said Quentin sent them back and forth to the front and back doors three or four times. She said that she went to the back door and saw the victim leave the bathroom. She said the victim did not look happy. She stated that Pot came out of the bathroom before the victim but that she did not see Quentin or the Defendant. B.K. said that when the victim came out of the house, B.K. was frustrated because her grandmother had been calling her. She said that the victim was trying to tell her something but that she "wasn't trying to hear it." She said the victim was quieter than usual on the walk home.

B.K. testified that she crawled into her grandmother's house through a window, that she did not remember if the victim went through the window, that the victim took a shower, that their grandmother was "hollering and screaming" at the victim, and that the victim told them what happened. She said the victim came out of the shower crying. She stated that she started walking back to the Wells' house but that a police officer stopped her. She identified the Defendant as the person whose name she did not know who was with them on July 31.

On cross-examination, B.K. testified that she and the victim were close and sent each other text messages approximately every other day. She said she had dated Quentin and the victim had dated Pot. She said the Wells' house was a couple of blocks from her grandmother's house. She admitted that she and the victim had been in trouble before July 31 for sneaking out of her grandmother's house. She said they blocked her bedroom door with a bunkbed before they left on July 31. She said an adult male, Tay, a cousin of Quentin, Ezekias, and Pot, was present on July 31. She said she did not hear what the Defendant said at the pool or the house.

B.K. testified that she told the police that when they were at the Wells' house after leaving the pool, the victim looked at her as if to question why she was following the victim. She agreed she told the police that Pot was the victim's boyfriend. After having her recollection refreshed, she recalled telling the police that she said, "I hope you had fun," to the victim. She acknowledged telling the police that the victim looked the same when she came out of the bathroom as she had beforehand. She did not recall telling a detective she thought the victim went into the bathroom to engage in consensual sex with the males. On redirect examination, B.K. denied telling the detective she thought the victim went into the house to have sex with the males and said she stated she thought the victim went into the house "just to be doing it," meaning just to be going into the house. She said her comment that she hoped the victim had fun referred to the previous occasion when the boys kept them in the house. She said, "[W]hen we go to the house, they play and lock doors and stuff so we don't leave and it takes us hours at a time to get back out of the house."

After B.K.'s recollection was refreshed with her recorded statement, she testified on recross-examination that when she was asked if she thought the victim went "in there" to have sex voluntarily with the males, she said, "That's what I thought." On further redirect examination, she stated that she did not think that anymore. She said Tay was not at the pool with them and was not around when they returned to the Wells' house. On further recross-examination, she stated that she did not know where Tay was and agreed that he could have been in the house. On further redirect examination, she stated that Tay was a year older than her and closer to her age than the Defendant's age. She said he did not look like the Defendant.

Betty Darden testified that her grandaughters, B.K. and the victim, lived with her in Summer 2008. She said she checked on the girls on July 31 and found the door to their room locked. She said they returned after 3:00 a.m. She agreed she was upset and worried. The victim told her on July 31 that she had been raped. She said that when the girls came home, they brushed by her and that the victim went into the bathroom and locked the door. She said she could tell something was wrong and asked what was wrong. The victim came out of the

bathroom and said she was raped. She said B.K. was angry and left to return to the Wells' house. She said she called 9-1-1. She described the victim as shaking, upset, and crying.

Ms. Darden testified that the police brought B.K. home and questioned the victim. She said that the police took the victim to a hospital and that another officer took her to the hospital. She said the victim's mother came to the hospital separately. She did not recall if she was in the room during the victim's examination. She stated that the victim said Pot, Quentin, and an "older guy" raped her. She said she had heard Pot's and Quentin's names but did not know them or their family. On cross-examination, Ms. Darden stated that B.K. and the victim entered her house through the front door when they returned. She did not know if B.K. called the Wells' house.

Metro Nashville Police Department Detective Jeff Wiser testified that he investigated the events in this case. He said he responded to the hospital on July 31, 2008, around 4:00 a.m. He said the victim, her grandmother, her cousin, and maybe a friend were there. He interviewed the victim alone. He said she was visibly upset. He said she reported that she and her cousin sneaked out of the house to go swimming with some males and returned to the males' house. He stated that she said a "grown man" forced her into the bathroom, took off her clothes or ordered her to remove them, and penetrated her vagina with his penis. He stated that she said another male came into the bathroom and penetrated her vagina with his penis, after which a third male did the same. He said the victim was able to identify her second and third assailants as Quentin and Pot. He said that he also interviewed B.K., Ms. Darden, and L. and that their statements were "[p]retty much" consistent with the victim's. He said they corroborated that the girls sneaked out of the house and returned and provided the names of the individuals involved but could not describe the Defendant.

Detective Wiser testified that he went to the house where the victim said the rapes took place. He said there were several people at the house, including Laquentin Wells and Corrichardson Wells. He said their mother, Willie Mae, and their aunt, Desi Radley, were there. He interviewed these individuals. He said there were also several children, whom he did not interview. He estimated there were ten people in the house. He said Willie Mae told him that the Defendant had been there earlier that evening, although he did not know if the Defendant lived there. He said Ms. Radley called someone to determine the Defendant's full name. He identified photographs he took of the house and the victim. He said he did not collect forensic evidence from the bathroom because there were so many people at the house that he thought the scene was contaminated.

Detective Wiser testified that he prepared and showed a photograph lineup to the victim, who identified the Defendant as the grown man who first entered the bathroom. He identified the lineup showing the circle the victim drew around the Defendant's photograph

and her signature. He said that when the victim picked the Defendant's photograph, she said the Defendant's hair was much shorter now. He said he obtained a warrant charging the Defendant with rape. He said he took custody of the evidence collected by Our Kids during the victim's examination.

Detective Wiser testified that he returned to the Wells' house to arrest the Defendant but that the Defendant was not there. He said "wanted" posters were distributed, the "flex unit" was notified, the media was contacted, and Crime Stoppers was notified. He said he returned to the house several times trying to locate the Defendant and to talk to Laquentin Wells and Corrichardson Wells. He told others at the house he was trying to find the Defendant. He said that the Defendant was eventually arrested and that several months later, he obtained a DNA sample with the Defendant's consent. He said the Defendant did not make any statements to him when he collected the sample. He identified a photograph of the Defendant with short hair and said the Defendant more closely resembled this photograph when he collected the DNA sample. He said he did not immediately obtain warrants for the other two suspects but eventually did so.

Julie Rosof-Williams, an expert in pediatric nursing in the field of forensic pediatric examinations, testified that as part of her duties with Our Kids Center, she examined the victim at the hospital and collected a sexual assault evidence kit. She said Phyllis Thompson, a social worker, talked with the victim before her examination. According to the records created from Ms. Thompson's interview, the victim stated that she and B.K. met Darnell, Ezekias, Quentin, and an unknown person. Quentin said he needed to tell the victim something and took her inside the house. He stated he wanted to go into the light to see her panties. When she did not respond, Quentin pushed her into the bathroom. The unknown man came into the bathroom and told her he wanted to see her panties. He made comments about her being pretty and having a nice body and put his hands down her pants and touched the outside of her vagina. The unknown man repeatedly told the victim to pull down her pants, and he unbuckled her belt. He penetrated her vagina from behind. She did not think he ejaculated. After the unknown man finished, she tried to leave, but Quentin came into the bathroom, pushed her back, and said, "[M]y turn." Quentin told her to bend over and began masturbating but could not achieve an erection. He eventually penetrated her vagina with his penis. She said Pot kept yelling from the hallway for Quentin to hurry. After Quentin left, the victim tried to leave, but Pot entered the bathroom. Pot asked the victim to perform oral sex on him, but she refused. Pot sat on the toilet, told the victim to come to him and pulled her arm, and penetrated her vagina with his penis. The victim stated that when Pot finished and she was able to leave the bathroom, B.K. told her she made "dumb decisions." The victim said she took a shower after going home and denied that anyone else forced her to touch them. The victim reported vaginal bleeding and pain when she urinated.

Ms. Rosof-Williams testified that the victim's only sign of injury was a small bruise inside her vagina. She said it was consistent with the victim's report of blunt force trauma from sexual penetration. She said it was very rare to find injury when examining a child for sexual abuse. She said that tests for sexually transmitted diseases were negative. She read her notes regarding the victim's demeanor, which said, "Laying [sic] in fetal position, sucking thumb, shocked, panic attacks, shivering, feels like going to throw-up." On cross-examination, Ms. Rosof-Williams stated that she could not provide an age for the bruise she observed and that she did not see bleeding.

The State offered as exhibits the birth certificates of Corrichardson Wells and Laquentin Walton.[1] They listed both men's parents as Willie Mae Walton and Richard Andrew Wells. Corrichardson Wells was twenty years old, and Laquentin Wells was less than one month shy of his eighteenth birthday on the date of the crimes.

Tennessee Bureau of Investigation (TBI) Special Agent Chad Johnson testified as an expert in forensic serology and DNA testing. Regarding DNA testing, he said it was not unusual for there to be an insufficient sample to provide a DNA profile. He said serology testing revealed the presence of semen in a sample from the victim's vagina. He said that at a later date, DNA testing was performed comparing the sample to standards from Corrichardson Wells, the Defendant, and the victim. He said that he obtained a male profile from the vaginal swabs but that the profile did not match the profiles for Corrichardson Wells or the Defendant.

Special Agent Johnson testified that the DNA profiles he developed were sent to a private laboratory for paternal testing, which was a method for determining if two profiles came from related individuals. He said that the private laboratory's analysis indicated that the semen stain from the vaginal swab and the standard from Corrichardson Wells were 118,307 times more likely to share genetic markers by descent than random inheritance and that the probability of a full sibling relationship was 99.99% as compared with an unrelated individual from the African-American population.

Special Agent Johnson testified that the absence of DNA evidence did not mean that Corrichardson Wells and the Defendant did not have sex with the victim. He said the factors affecting whether DNA evidence was present included whether the perpetrator ejaculated in the victim's vagina and whether a condom was used. He said a forensic finding of a single semen stain was consistent with a scenario in which three men had sex with a victim but only one man ejaculated inside the victim. He said it was possible, though, that "touch DNA"

_____

[1] The witnesses who identified Laquentin with a surname used the surname Wells. The birth certificate introduced by the State shows Laquentin Andrew Walton.

-10-

might remain from a person's physical contact with another surface. He said semen from ejaculation deposited more DNA evidence than epithelial cells that might be deposited from the friction of intercourse or pre-ejaculate fluid. He said that DNA from these sources would be obscured by the greater amount of DNA material from sperm deposited from ejaculation. He said there was no way to differentiate in the laboratory between pre-ejaculate fluid and ejaculate fluid.

On cross-examination, Special Agent Johnson testified that he probably would not have obtained a DNA profile if no one ejaculated. He said that based upon the amount of sperm on the swabs, a person ejaculated inside the victim's vagina. He agreed there was no DNA evidence linking the Defendant to the alleged crime. When asked if the report from the private laboratory excluded the possibility that the semen was from a cousin of Corrichardson Wells, he stated that he was not trained in paternal testing and based his testimony on the statements in the report.

On redirect examination, Special Agent Johnson testified that a "different program" was used to determine whether a sample contained the DNA of a cousin of the person who provided a second DNA sample. He said he asked the private laboratory to analyze the samples for a sibling relationship. He thought the victim's clothing was not submitted to the TBI Laboratory for testing and said the TBI's policy was not to test clothing if a positive result was obtained from vaginal swabs.

Metro Nashville Police Officer Shedie Herbert testified that he was a member of the Metro Davidson Housing Authority Task Force. He said he obtained a warrant for the Defendant's arrest on August 28, 2008, during a routine traffic stop in Sam Levy Homes. He said that he stopped a car with an obscured temporary license plate and that the Defendant got out of the driver's side of the car, looked at him, and fled on foot two to five seconds later. He did not think he had left his car when the Defendant fled. He said that this was during daytime and that he had a good opportunity to view the person. He said he was working alone and called for other officers to respond while he waited with the white Impala the Defendant drove. He said that another officer who responded knew the Defendant's identity based upon the car the Defendant was driving and told him the police were looking for the Defendant. He said that he viewed a mugshot by searching with the name the other officer provided and that the person who fled was the same person depicted in the mugshot, although the person who fled had less facial hair and a different haircut. On cross-examination, he said it was fairly common for individuals to flee from the police in the area where he was working.

Metro Nashville Police Officer Daniel Herndon testified that he was on patrol on August 29, 2008, when he stopped a white Impala due to an obscured temporary license

plate. He said the Defendant was a passenger in the car. He said the Defendant got out of the car, looked at him for a second, and ran. He said that he provided other officers with a detailed description of the Defendant and that about five to ten minutes later, another officer came to the scene with the Defendant. He said he determined that the Defendant had outstanding arrest warrants.

On cross-examination, Officer Herndon testified that the Defendant was a passenger in the white Impala and that the Defendant was not obligated to stay at the scene of the stop. He agreed that a criminal charge was dismissed on this basis.

The Defendant did not present proof. The jury found the Defendant guilty of aggravated rape, rape, aggravated statutory rape, and evading arrest. The rape and aggravated statutory rape convictions were merged with the aggravated rape conviction. The trial court later vacated the conviction for aggravated statutory rape because the evidence was insufficient to show the Defendant's age as related to the victim's age. The court denied the motion for a new trial for the remaining convictions, and this appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his aggravated rape conviction. The State counters that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S .W.2d 651, 659 (Tenn. 1997).

The Defendant argues that there is insufficient proof that he was aided or abetted by anyone or that he used force or coercion to accomplish sexual penetration of the victim. He also argues that the evidence does not establish his guilt of the offense of rape because the proof fails to show that the victim did not consent to sexual penetration. The defense conceded at oral argument, though, that there was sufficient proof the victim did not consent. As relevant to this appeal, the aggravated rape statute provides:

(a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

. . .

(3) The defendant is aided or abetted by one (1) or more persons; and

(A) Force or coercion is used to accomplish the act[.]

T.C.A. § 39-13-502(a)(3)(A) (2010).

## A. Force or Coercion

For the Defendant to be guilty of aggravated rape, he must also have committed the offense through the use of force or coercion. The Criminal Code provides that with regard to sexual offenses, "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title[.]" T.C.A. § 39-11-106(a)(12) (2010) (amended 2011). "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future[.]" *Id.* § 39-13-501(1) (2010).

The Defendant argues that there was no coercion because the victim was never threatened and that there was no force because the victim was never forced to do anything. He argues that, at most, the victim may have been nudged into the bathroom by Laquentin Wells, not the Defendant, and that a nudge is not the type of force contemplated by the statute.

In the light most favorable to the State, the evidence demonstrates that the Defendant, an adult, and Laquentin Wells, who was one month shy of his eighteenth birthday, trapped the fourteen-year-old victim on a staircase by standing at either end of it. Mr. Wells tried to get the victim to go inside, and when she refused, he pulled her by her arm into the house. The Defendant and Mr. Wells told the victim to go into the bathroom and show them her panties, and when she refused, one of them nudged her into the bathroom. She said it was a "little nudge" with the person's hand on her shoulder. The Defendant came into the bathroom and closed the door, leaving the victim no route of escape. The Defendant told the victim to show her panties to him, and after she refused, he unbuckled her belt and pulled down her pants. The victim did not fight the Defendant or the other attackers because she

was afraid they would hurt her. This evidence is sufficient to establish that the Defendant accomplished the sexual assault by compulsion of the victim through his and Mr. Wells' physical power. This evidence likewise establishes coercion because the Defendant's and Mr. Wells' actions conveyed a threat of kidnapping, force, or violence if the victim did not accede to their sexual assaults. The Defendant is not entitled to relief.

## B. Lack of Consent

As we have noted, the Defendant argues that the State failed to show the victim did not consent to having sexual intercourse with the Defendant, but the Defendant conceded at oral argument that lack of consent was shown. The victim testified that she told Mr. Wells "no" when he asked her to go inside and that she refused to show Mr. Wells and the Defendant her panties. She testified she did not want to have sex with the men but did not fight them due to fear of harm. The evidence is sufficient to support the jury's finding of lack of consent.

## C. Aiding and Abetting

Relative to aiding and abetting a rape, three elements must be shown:

(1) Presence (actual or constructive), *Watson v. State*, 158 Tenn. 212, 12 S.W.2d 375, 377 (1928);


(2) Intent that the crime be committed, *Presley v. State*, 161 Tenn. 310, 30 S.W.2d 231 (1930); and

(3) Participation by which the crime is encouraged, procured, assisted or otherwise promoted. *Flippen v. State*, 211 Tenn. 507, 365 S.W.2d 895, 899 (1963).

*State v. Woody J. Dozier*, No. 02C01-9610-CC-00357 (Tenn. Crim. App. Nov. 4, 1997) (Tipton, J., concurring), *perm. app. denied* (Tenn. Sept. 14, 1998). *But see Woody J. Dozier*, slip op. (lead opinion) (stating that an aider and abetter need not share the criminal intent to commit a rape); *see also State v. Jackie Caldwell*, No. E2008-00307-CCA-R3-CD (Tenn. Crim. App. Oct. 6, 2009), *perm. app. denied* (Tenn. Mar. 18, 2010); *State v. McGuire*, No. 03C01-9705-CC-00191 (Tenn. Crim. App. Oct. 2, 1998) (relying on lead opinion in *Woody J. Dozier*).

In the light most favorable to the State, the evidence reflects that the Defendant was aided and abetted by another in his perpetration of the rape. The victim was at the front of the Wells house with the Defendant and Laquentin Wells, that they complimented the victim's looks, that Laquentin Wells asked her to have sex with him, and that Mr. Wells attempted to persuade her after she refused. After B.K. declined her request that they go home, she approached Darnell, who was talking to L., but Darnell asked her why she was "cock blocking." She went to the back of the Wells house. The Defendant and Laquentin Wells stood above and below her as she stood on the steps to the house's deck. Mr. Wells twice asked her to go inside, and she refused. Mr. Wells stated that he wanted to tell her something, took her by her arm, and forced her inside. Mr. Wells and the Defendant told her to go into the bathroom and show them her panties, but she refused. One of them nudged her shoulder with his hand and made her go into the bathroom. The Defendant entered the bathroom, closed the door, demanded to see her panties, unbuckled her belt, pulled down her pants, made her bend over the toilet, and penetrated her vagina with his penis. Although she did not recall if the Defendant locked the door, he stood near the door and sink, and she could not leave the bathroom. She did not resist because she did not want to be hurt. Although the Defendant did not physically force her to bend over the toilet, she did not feel like she could stop him. Following the Defendant's attack, Laquentin Wells and Corrichardson Wells entered the bathroom. The Defendant and Corrichardson Wells sexually assaulted her, and Laquentin Wells attempted to but was unable to penetrate her. The evidence shows that the Defendant raped the victim and that he was aided and abetted by, at least, Laquentin Wells. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred in admitting evidence of (1) the victim's statements to a social worker and the social worker's impressions of the victim; (2) Ms. Rosof-Williams's testimony about the rape kit form; and (3) Detective Wiser's testimony about his conversation with the victim. The Defendant argues that had the proper hearing taken place, the court would have limited the proof to the fact of penetration and would have excluded hearsay evidence of the details of the Defendant's conduct and the attempted sexual assault by Laquentin Wells and the sexual assault by Corrichardson Wells. The State counters that the Defendant waived any objection to the admission of the evidence by failing to object to the testimony of Ms. Rosof-Williams and Detective Wiser. We agree with the State that the claim has been waived and conclude that plain error does not exist.

The Rules of Appellate Procedure provide that this court is not required to grant relief to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). In *State v.*

*Thompson*, this court held that by failing to make a contemporaneous objection at the trial, the defendant waived appellate consideration of his claim that the trial court erred in admitting a nurse's testimony about another nurse's examination of the victim. 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Similarly, the court held that by failing to object at the trial, the defendant waived appellate consideration of his claim that the court erred in admitting the medical records generated by the examining nurse through the testimony of the testifying nurse. *Id.* at 108-09. Because the Defendant failed to object to the admission of the evidence at the trial, he is not entitled to relief unless there was plain error. *See* T.R.A.P. 36(b). We have reviewed the record and conclude that no plain error occurred. The Defendant is not entitled to relief.

**III**

The Defendant contends that the assistant district attorney committed prosecutorial misconduct during the opening statement when she stated that the Defendant, Corrichardson Wells, and Laquinten Wells were like pack animals. The relevant portion of the opening statement is:

> Many of you probably watch shows on Channel 8, nature national geographic about how animals hunt in the wild, an example would be wolves, they run in packs, in groups and they follow their prey as they look for something to eat, they often follow them and they look for a person or an animal that is weak in order to kill, and when they get the opportunity, they pounce. On the 31st of July of 2008, Terrance Jordan, Corrichardson Wells and Quentin Wells were hunting for something, but it wasn't food, it was sex, and the perfect victim that they found was 14-year-old [victim].

The State contends that the Defendant waived appellate review of the issue by failing to make a contemporaneous objection. The State contends alternatively that even if the remark was improper, it was isolated and did not affect the verdict. The record reflects that the Defendant did not object to the opening statement. The issue is waived, and our review is limited to the question of plain error.

Although the prosecutor's analogy was inappropriate, the record reflects that it was not significant in the context of the overall opening statement or the trial. *See State v. Bishop*, 582 S.W.2d 86, 91 (Tenn. Crim. App. 1979) (stating that in view of the strength of the evidence, the prosecutor's closing argument comparing the defendant to an animal and mentioning the defendant's right to refuse questioning at the jail had a minimal effect and could not have affected the verdict). The Defendant has not shown that a substantial right

of the accused was adversely affected or that consideration of the error is necessary to do substantial justice.  There was no plain error.

**IV**

We note as a matter of plain error that despite the trial court's merging the rape and aggravated statutory rape convictions with the Defendant's conviction for aggravated rape, the record improperly contains separate judgments and sentences for the merged convictions. There should not be separate judgments listing sentences for the merged convictions. Noting merger in the special conditions portion of the judgments does not suffice.  As we have mentioned, the aggravated statutory rape conviction was vacated by the court.   The judgments for rape and aggravated rape must be vacated and a single judgment noting merger of the two counts must be filed.

In consideration of the foregoing and the record as a whole, the Defendant's convictions are affirmed.  Although we affirm the aggravated rape and rape convictions, the judgments for those counts are vacated, and the case is remanded to the Davidson County Criminal Court for entry of an single judgment noting merger of these convictions.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE