CHARLES E. WATSON *v.* THE STATE.*

(*Nashville.* December Term, 1928.)

Opinion filed December 24, 1928.

---

*As to criminal responsibility of one aiding and abetting in commission of offense which he is incapable of committing personally, see annotation in 5 A. L. R., 782; 1 R. C. L., 145.

214

FLOYD ESTILL and R. J. BORK, for plaintiff in error.

L. D. SMITH, Attorney-General and SHEPHERD, CARDEN & CURRY, for the State.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The plaintiff in error has been convicted of aiding and abetting in the embezzlement of public funds, the property of the State of Tennessee and of Hamilton County, and has been sentenced to the penitentiary for a maximum term of five years.

A motion to quash the indictment was made in the court below and exception duly taken to the action of the trial judge in overruling said motion. A consideration of the questions thus raised, renewed in this court, makes it necessary to set out the indictment. Omitting the caption and formal parts, the first count of the indictment is as follows:

"That Charles E. Watson heretofore on the 11th day of November, 1922, in the County aforesaid did unlawfully, feloniously and fraudulently counsel, move and procure W. A. Whitice who was at the time the duly qualified and acting clerk of the county court of Hamilton County, one of the counties of Tennessee, to appropriate, use and embezzle of the public funds in his care and keeping as such official the sum of $17,497.91 the personal property of the State of Tennessee and Hamilton County, one of the counties of Tennessee, which said funds were appropriated from the public account by the said W. A. Whitice and loaned or given to the said Charles E. Watson, and said funds were appropriated, received and used by the said Charles E. Watson, for his personal benefit and convenience he well knowing that such funds were taken from the public account of the said W. A. Whitice as county court clerk and unlawfully appropriated to such use and the said Charles E. Watson having procured such appropriation by the said W. A. Whitice by persuasion and promise of repayment and replacement of such funds.

"Wherefore the grand jurors say and present that the said Charles E. Watson has incited and aided and abetted and assisted the said W. A. Whitice in the unlawful appropriation and embezzlement of public funds as aforesaid."

The second count of the indictment is the same except that it charges that plaintiff in error did on the 6th day of July, 1923, counsel, move and procure Whitice to embezzle certain funds in the sum of $15,108.22, the personal property of the State of Tennessee and Hamilton County.

*(1)* It is urged that both counts of the indictment are void for uncertainty, in that it cannot be determined from the allegations thereof whether it was intended to charge the defendant below as accessory before the fact or as aider and abettor. Each count of the indictment concludes by presenting "that the said Charles E. Watson has incited and aided and abetted and assisted the said W. A. Whitice in the unlawful appropriation and embezzlement of public funds as aforesaid."

We see no occasion for uncertainty as to the meaning of this indictment. It purports on its face to charge the defendant with aiding and abetting in the offense specified. It could scarcely be construed as a charge that he was an accessory before the fact. An accessory before the fact is one who, while absent, moves or counsels an offense. *State* v. *Ayers,* 67 Tenn. (8 Baxt.), 96; *Pierce* v. *State,* 130 Tenn., 24.

*(2)* Section 6574, the statute directed against embezzlement by a public officer, makes it criminal, among other things, to use any part of the State or county funds in his custody "by loan, investment or otherwise without authority of law." The indictment here charges that the defendant procured Whitice, the county court clerk, to *lend* or *give* to said defendant stated sums of the public money and thus aided or abetted in the embezzlement. There could be no loan or gift without delivery. The recipient of the loan or gift is necessarily present in the

transaction, either in person or by agent. Otherwise the loan could not be consummated. The defendant below could not well have been treated as an accessory before the fact, under the indictment, when it was further charged that he himself received and appropriated and used the unlawful loan, and defendant could not be considered as absent from a transaction in which he participated to such an extent.

In passing it may be observed, in reply to a suggestion made in the argument, that we are of opinion the indictment sufficiently identifies the transactions upon which it is based to put defendant on notice of the things with which he was charged and to afford him adequate protection against any other charges of the kind.

It is further insisted in the attack upon the indictment that neither count thereof is sufficient to charge the defendant as aider and abettor in the absence of averments that he was present at the time of the commission of the alleged embezzlement.

It is true that the word *present* was not used in either count of the indictment. In view of the other language employed, the use of this word would have been superfluous. The presence of defendant was necessarily involved and unmistakably averred by the expressions employed. As above pointed out, he must have been present, either in person or by his agent, to have received the loan or gift.

*(3)* It is not necessary in framing a statutory charge to use the identical words of the statute, if equivalent words are used.

*(4)* Only a constructive presence is necessary to sustain a charge against a defendant as an aider or abettor, or principal in the second degree, in the commission of

a criminal offense. This is distinctly recognized in *Pierce* v. *State, supra,* and other decisions of this court. The law is well settled to this effect everywhere. One may be entirely out of the jurisdiction of the court, in another State, in person, and still be constructively present in the jurisdiction where the criminal transaction takes place.

In *Regina* v. *Garrett,* 17 Jur., 1060, Lord CAMPBELL said: "I do not proceed upon the ground that the offense was committed beyond the jurisdiction of the court, for if a man employ a conscious or unconscious agent to commit an offense in this country, he is amenable to the laws of England although at the time the offense was committed he was living beyond the jurisdiction."

*In Simpson* v. *State,* 92 Ga., 41, 22 L. R. A., 248, the court said: "Of course the presence of the accused within this State is essential to make his act one which is done in this State, but the presence need not be actual. It may be constructive. The well-established theory of the law is that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual."

*(5)* It is a maxim of the law that a crime carries the person, *crimen trahit personam.*

So far as an absent principal is concerned, our statute covers his case.

"When the commission of an offense commenced without this State is consummated within its boundaries, the person committing the offense is liable to punishment therefor in this State, although he was out of the State at the commission of the offense charged, if he consummated it in this State, through the intervention of an innocent or guilty agent, or by any other means pro-

ceeding directly from himself, etc. etc." Thompson's-Shannon's Code, sec. 6934.

Under the general principle announced, regardless of statute, when the offense is one of the character under consideration, one participating therein by receiving the loan is bound to be regarded as present, actually or constructively. Otherwise the crime could not be consummated.

It is conceded on the brief for plaintiff in error that a defendant may be prosecuted as aiding and abetting in the commission of the crime, although the crime is of such a nature that personally he cannot be guilty thereof. A familiar illustration is that a woman may be held to answer as aiding and abetting in the crime of rape, although personally she cannot commit this crime herself. All the cases to this effect are collected in a note in 5 A. L. R., 782.

So, while the plaintiff in error, not being a public officer at the time the embezzlements here were alleged to have been committed, could not have been presented as a principal, he is nevertheless amenable to prosecution as an aider and abettor.

Passing to a consideration of the assignments of error based on the failure of the court to direct a verdict in favor of defendant below certain technical questions are presented.

(6) It is contended that there is a fatal variance between the indictment and the proof in that both counts of the indictment alleged that the funds embezzled were the personal property of the State of Tennessee and Hamilton County and that the State submitted no proof to sustain this allegation.

We do not find such a variance. It is true that an indictment for embezzlement should contain an allegation as to the ownership of the property misappropriated. This indictment charged that the funds misapplied were the property of the State of Tennessee and of Hamilton County.

The proof did not show that any of the money embezzled was the joint property of the State and county. Part was the property of the State and part the property of the county.

It is well settled under the authorities that in an indictment against an official for the embezzlement of public funds in his custody, belonging to the State and county, or to several townships, it is not necessary to specify nor to prove what particular part of the fund belonged to each particular government entity. *Brown* v. *State,* 18 Ohio State, 496; *State* v. *Flint,* 62 Mo. 393; *State* v. *Ensley,* 177 Ind., 483; Anno. Cas., 1914D, 1306.

No objection was taken to this indictment for duplicity. It was not claimed below, as to either count, that said count stated two offenses one of aiding in embezzlement from the State and one of aiding in embezzlement from the county. The defendant below went to trial without making any objection of this nature to the indictment, nor do we intend to intimate that such an objection would have been good, as in a larceny case.

(7) An examination of section 4706 and section 4708 of the Code of 1858 shows that, in the Code, the first section was entitled "Embezzlement by public officer," and the second section entitled "Embezzlement by private clerk, etc."

Under the statutes of Tennessee, trustees, county court clerks and other public officials are intrusted with

the custody of both State and county funds. We think that the essence of section 4706 is the denunciation of the embezzlement by a public officer of such public funds, State or county. It is not material whether the funds embezzled belong to the State or to the county, nor is it material in what proportions, if such funds belong to both State and county. Breach of trust is the gist of embezzlement, not taking the property of another. We, therefore, think that such an act of misappropriation by a public officer, whether the funds misappropriated belong to the State or to the county, or to both, is a single criminal act—one offense, to-wit, embezzlement by a public officer.

The language in section 6574 ''any person within this State charged with the collection, safekeeping, transfer or disbursement of money or property belonging to the State or any county'' is descriptive of the person who is to be regarded a public officer under this statute. An indictment is sufficient under the statute which charges any officer of this kind with a prohibited use of money or property in his hands as such officer, without undertaking to aver the respective interests of the State and county therein. Such is the holding of *Brown* v. *State, supra; State* v. *Flint, supra; State* v. *Ensley, supra,* and the statutes against embezzlement by public officers in those States are similar to ours. Reading section 4706 of the Code of 1858, section 6574, Thompson's-Shannon's Code, in connection with the marginal title attached to said section by the Code of 1858 heretofore quoted, the import of our statute is practically equivalent to that of the statutes construed in the cases cited.

The indictment in this case seems to us as specific as it was possible to have made it under the circumstances.

The proof likewise was as definite as it was possible to make it and followed the indictment. The State and county funds were commingled by Watson and by Whitice, while Watson was clerk and Whitice was deputy and later when Whitice became clerk. The misappropriations were made up out of funds belonging in part to the State and in part to the county. The proof seems clear as to that.

*(8)* It is also argued that a verdict should have been directed for defendant below because there was no proof of an embezzlement by Whitice under any view of the evidence. The State's theory, which its proof tended to establish, was that the plaintiff in error, Watson, the predecessor of Whitice as county court clerk, was short when his term expired. That Watson procured Whitice to lend to him (Watson) public funds with which Watson made good his shortage in said funds. It is said that inasmuch as the State and county funds taken went to the State and county, there was no taking away of any property from its owner.

This contention, while plausibly maintained, cannot be accepted. The State's proof tends to show that the public funds embezzled by Whitice, here in controversy, were abstracted and placed to the credit of Watson in Chattanooga banks, and such funds were then transferred by Watson's check to the State and county in settlement of his shortage.

Under *Commonwealth* v. *Este,* 140 Mass., 279, and other cases relied on by plaintiff in error, there was a clear case of embezzlement here. In *Commonwealth* v. *Este,* it was said that "when property is held at every moment as and for the master's property, fraud as to the source from which it comes or fraudulent intent as to

something else, is not a sufficient substitute for the missing element,'' the missing element referred to being the deprivation of the owner of his property by an adverse holding or use. While this fund was in the banks to Watson's credit there was a use or holding adverse to that of the State and county.

It would be out of the question to construe our embezzlement statute as to public officers in the manner in which counsel insist we should. Under such a construction, an embezzler, who later embezzled enough money to cover his shortage, could never be held to answer. By section 4707, Code of 1858, section 6575, Thompson's-Shannon's Code, if such officer pay over and account for the money abstracted by him, he is not amenable to the provisions of section 4706, Code of 1858, section 6574, Thompson's Shannon's Code, heretofore set out. His second offense would not be embezzlement under the construction insisted upon, and his first offense would be condoned by the proceeds of his second offense. The public funds could thus be depleted with impunity.

Plaintiff in error Watson was elected clerk of the county court of Hamilton County in 1914 and re-elected in 1918. The proof shows that during his first term, and a part of his second term, his office was admirably conducted, and his settlements all promptly made. Whitice was chief deputy during both of Watson's terms and in 1922 Whitice was elected county court clerk as Watson's successor.

While Watson was in office the fee system prevailed, and his emoluments from this source ran between $15,000 and $20,000 annually. He seems to have made various investments and it is rather clear from the record that some of the enterprises into which his money went turned

224

out badly and that toward the close of his second term Watson was involved and short of money.

About a year before the expiration of his term, Watson's office began to fall behind in making settlements with the State and county. Settlements for each calendar month were due on the fifteenth of the subsequent calendar month. Watson's office was delinquent from one month to two months or more in such settlements. The county auditor testified that he talked to Watson repeatedly about these delays and remonstrated with him.

It must be conceded on the evidence that when Watson's second term expired, August 31, 1922, he did not have on hand sufficient funds, by many thousands of dollars, to pay what was due from his office to the State and county. A final settlement was due from him on September 15, 1922, but was not made until November 27, 1922.

On the date last named Watson's balance in the Hamilton National Bank, where he was supposed to keep funds belonging to the county, fell short of what he owed the county about $17,000. His balance in the First National Bank, where he was supposed to keep funds belonging to the State, fell short of what he owed the State about $2000. On this day Whitice deposited in the two banks sums of money sufficient to cover the shortage just mentioned. Checks drawn against the two accounts and signed by Watson were then turned over by Whitice to the State and county representatives, for the respective amounts due the State and county, and settlements thus made on Watson's behalf.

It is with respect to the $17,000 deposited in the Hamilton National Bank, as just detailed, that the first count of the indictment complains.

Whitice testified that when Watson's term expired, there was not sufficient money on deposit to settle with the State and county and that upon Watson's solicitation, he (Whitice) agreed to advance out of the funds coming into his custody, by way of loan, as soon as he could, sufficient amounts for Watson to pay the State and county. Whitice said that Watson had given him a place as deputy clerk in 1914, which he retained until Watson went out of office. That he and Watson were close friends; that Watson had helped him frequently during their association in a financial way; and that Watson had backed him financially to the extent of several thousand dollars when he (Whitice) made his own race for clerk as Watson's successor.

Whitice said that Watson recalled his former acts of kindness and pecuniary assistance rendered Whitice, insisting that he had helped Whitice when Whitice was in trouble, and now Whitice must help him. Whitice said that he yielded to these requests of Watson, under the circumstances stated, and put the money in the banks to Watson's credit as above detailed, at Watson's solicitation. Whitice further testified that he had no money of his own, that his salary had been $125 a month during part of his service under Watson and $150 a month the rest of the time. He had a wife and six children to support, and consequently had not been able to accumulate anything. That Watson knew all about his circumstances and knew that the money that he (Whitice) agreed to put up for Watson to make his settlements was to come out of public funds and did come out of public funds.

In addition to the accounts in the First National Bank and the Hamilton National Bank, Watson kept a sep-

arate account in the American Trust & Banking Company where he was supposed to deposit his inheritance tax collections, direct and collateral. Settlements on this account were made direct with the Comptroller at Nashville. No settlement with respect to inheritance taxes had been made with the Comptroller for several months prior to the expiration of Watson's term. When his term expired, he owed the Comptroller about $50,000 on account of direct inheritance tax collections and about $10,000 on account of collateral inheritance tax collections. The inheritance tax books seemed to have been kept by a young woman named Miss Ferguson, a clerk in Watson's office. She appeared to have been intrusted with some checks signed in blank by Watson which she was expected to fill out and use from time to time in making remittances of inheritance tax collections to Nashville. She supposed that the money that her books showed should have been on deposit to this account in the American Trust & Banking Company was in reality there. Upon the expiration of Watson's term accordingly, without consultation with him, she filled out two of the checks he had signed, one for $50,000 on account of direct inheritance tax, and one for $10,000 on account of collateral inheritance tax, and mailed these checks to the Comptroller of the State.

According to Whitice, Watson learned that the young lady had sent off these checks. His balance in the American Trust & Banking Company was upwards of $20,000 short and Whitice said that Watson called the Comptroller over the telephone and asked that the two checks just mentioned be returned to him, on the claim that there was a discrepancy between the amount due and

the amount for which the checks called. The checks were accordingly returned.

When these checks were sent back to Chattanooga, they were held there for some months, and no other remittance made to Nashville.

Along in February, 1923, the Comptroller having become insistent about a settlement, the check for $10,000 to cover collateral inheritance tax collections was again sent to Nashville, and this check was paid. There was still left unsettled, however, the balance of about $50,000 due from Watson on account of direct inheritance tax collections, and in the summer of 1923 the Comptroller or the Commissioner of Finance and Taxation sent a state auditor to Chattanooga to force a settlement with Watson.

The auditor testified that he had considerable difficulty in locating Watson but finally found him and Watson claimed that his delay in paying over this fund was due to the shortage of a young woman, who was clerk in his office. Watson claimed that the young woman was some $9000 short and he had been waiting on her to make good.

The auditor made peremptory demand for a settlement and within the next few weeks Watson got together money and discharged this obligation. Sometime later a penalty was exacted of him or his bondsmen by reason of this delay.

Whitice testified when the auditor came over in the summer of 1923 and began to press Watson for settlement of his direct inheritance tax collections, that Watson came to see him (Whitice) and made appeals, similar to those he had made the previous fall. Litigation was then in progress concerning the Fee Bill of 1921, the constitutionality of which was later sustained by this

court. There was grave doubt about the validity of this enactment, and Whitice testified that Watson insisted that the Act would be held unconstitutional and Whitice would then be able to collect a large amount of fees and take care of the advance that Watson was asking. Whitice said he again yielded to Watson's importunities and put up the $15,000 which is made the basis of the second count of the indictment, to enable Watson to pay off what was due from him by reason of direct inheritance tax collections. Whitice said that this $15,-000 came out of public funds in his custody, that it was made up of checks drawn on his official bank accounts and of $2000 or $3000 in cash. These checks and this cash was turned over to Watson in person, and Whitice said that Watson knew the source of the funds.

At the time that the settlement was made with the State and county in November, 1922, the record shows that Watson was not in Chattanooga, and Whitice acted for him. He was, however, present, as just noted, and received in person the $15,000 from Whitice in the summer of 1923. Testifying in his own behalf, Watson stated that he had been connected with several fraternal organizations, in an official capacity. That his official duties, in behalf of said orders, during the last two years of his second term, required his absence from Chattanooga most of the time. He said that he intrusted the management of the office of county court clerk entirely to Whitice, in whom he claimed to have the utmost confidence.

Watson said that when his term expired, he supposed that he had at the Chattanooga banks in his official accounts sufficient credits to discharge all his obligations to the State and to the county. He said that Whitice

agreed to make settlements for him; that he (Watson) went out of town and intrusted the making of all the settlements to Whitice. He claimed that his first knowledge of any shortage in his office was in the summer of 1923 when the auditor came over from Nashville to demand settlement of his collections on account of direct inheritance taxes.

Watson denied that he knew anything about a telephone message to Nashville recalling the $50,000 check and the $10,000 check sent over by Miss Ferguson, the details of which transaction we have previously set out. He said that any such telephoning must have been done by Whitice and the checks received by Whitice when they were returned to Chattanooga. He denied that he had ever had any notice of complaints from the Comptroller during the winter of 1922-23 about the delay in this settlement.

Watson testified that he knew nothing of the details of the settlement that Whitice made in his behalf with the State and county on November 27, 1922. He merely understood that such settlement had been made and supposed that it had been made out of funds collected while he (Watson) was clerk. He denied having made any arrangement with Whitice to borrow this money and denied any knowledge that the money came from the official accounts of Whitice.

Watson said that he supposed the $15,000 he got from Whitice in the summer of 1923 to settle the inheritance tax collections was Whitice's own money. That Whitice told him he had his own funds and the public funds commingled and he (Watson) was therefore willing to take the checks that Whitice gave him, which we have heretofore mentioned. The effect of his testimony was that

any abstractions from this inheritance tax fund must have been made by Whitice and that in procuring the $15,000 from Whitice, he was getting back what Whitice owed him, out of money belonging to Whitice, as he (Watson) thought.

The foregoing presents the substance of the testimony given on the trial by Whitice and by Watson. If Whitice is to be believed, the verdict against Watson is well sustained by the proof, if Watson is to be believed, the result, perhaps, should have been different.

We think the circumstances appearing in the proof, and the testimony of other witnesses, all tend to confirm the evidence of Whitice.

When Whitice went out of office he was upwards of $60,000 short. Of this $60,000, about $30,000 went to pay the shortage of the office accrued during Watson's term. There can be no doubt about the latter statement. The only question on the facts is as to Watson's knowledge.

Watson must have known there was something wrong with his office for the last year of his term. The county auditor frequently complained to Watson about the delay of that office in making the monthly reports and settlements. Watson admits two such complaints by the county auditor.

During the latter part of Watson's term, Whitice was constantly overdrawn in the office. Whitice was leading a fast life and spending much more money than he was making. He had duebills in the cash drawer which he would take up from time to time with bad checks and the checks would be returned to the office by the banks. It is impossible to see how all these things could have escaped Watson's attention. It is impossible to understand how he could have retained Whitice in his office,

unless he too was stealing, and afraid to proceed against Whitice.

It is unbelievable that an official responsible for large sums of money would go off at the close of his term and allow settlements involving him and his bondsmen to the extent of many thousands of dollars to be made by a mere clerk. It is unbelievable that an official under such heavy obligations should go off and assume that these obligations had been settled by some clerk without any personal investigation.

There are many unbelievable things in Watson's testimony which the jury naturally discredited, and which we have not space to set out.

Watson, of course, knew that Whitice had no money. He had known Whitice for years, knew about his large family, and admitted that he had to finance the race which Whitice made for county court clerk. Watson knew that Whitice could not have accumulated $15,000 from September, 1922, to August, 1923, and Watson knew that the $15,000 he took from Whitice in August, 1923, must have been public funds.

Miss Ferguson testified that she called up Watson sometime during the fall of 1922 about the complaints from the Comptroller's office upon the delay in settling the inheritance tax collections. It also appears that Miss Ferguson was not short at all in the office. So that Watson's claim as to her shortage, made to the State auditor as an excuse for his delay, and his claim that he knew nothing about the inheritance tax shortage until the summer of 1923 are both overthrown.

Part of the shortage accruing during Watson's term was some $16,000 deposited by Whitice to the credit of Watson's personal account in the Hamilton National

Bank on September 15, 1922. This deposit was made up of public funds according to Whitice, but went to Watson's personal account. When the deposit was made, Watson was overdrawn about $14. He checked out this $16,000 and lived on it during the next twelve months and yet he claims in his testimony that he had no knowledge that Whitice had made any such deposit to his credit.

(9) Without further reviewing the facts, we are satisfied that there is no preponderance of evidence against the verdict and judgment below. Some other assignments of error are made in which we find no merit. There is no error on the record which calls for a reversal of the case and the judgment below must be affirmed.

For the sake of accuracy, it should be said that the record does not show Watson got all of the $15,000 upon which the second count of the indictment is based. He and Whitice do not agree as to how much this misappropriation was. It was somewhere between $7000 and $12,000. This, of course, does not in any way affect the results.