# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 4, 2025 Session

## STATE OF TENNESSEE v. RONALD MATTHEW LACY

**Appeal by Permission from the Court of Criminal Appeals**
**Loudon County Criminal Court**
**No. 2015CR96      Jeffery Hill Wicks, Judge**

_____

### No. E2022-01442-SC-R11-CD
_____

Ronald Matthew Lacy was a luxury car middleman. In 2015, through a series of electronic communications sent from Kentucky, Lacy persuaded the owner of a car dealership in Tennessee to wire him funds for a Mercedes. But Lacy never delivered the Mercedes or returned the funds. In this appeal, we consider whether a Tennessee court had statutory territorial jurisdiction to convict Lacy of theft for that conduct. We conclude that it did. We further conclude that Lacy's theft conviction was supported by sufficient evidence. We therefore uphold Lacy's conviction and affirm the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affimed**

SARAH K. CAMPBELL, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, DWIGHT E. TARWATER, and MARY L. WAGNER, JJ., joined.

B. Isaac Gibson and John M. Gambrel, Pineville, Kentucky for the appellant, Ronald Matthew Lacy.

Jonathan Skrmetti, Attorney General and Reporter, J. Matthew Rice, Solicitor General, Matthew D. Cloutier, Assistant Solicitor General, and William C. Lundy, Assistant Attorney General; L. Russell Johnson, District Attorney General; and Robert C. Edwards and Jed Bassett, Assistant District Attorneys General, for the appellee, the State of Tennessee.

# OPINION

## I.

Ronald Matthew Lacy was a luxury car broker and the owner of Matthew the Car Guy, Inc. Lacy resides in Kentucky, and his business is a Kentucky corporation.

In 2015, Lacy offered his services to Christopher Dyer, a Tennessee resident. Dyer owned a small car dealership in Lenoir City, Tennessee, called Evolution Motor Cars that sold luxury vehicles to high-end buyers. He often worked with other dealers and brokers to locate vehicles for those buyers. Lacy and Dyer engaged in three deals during the spring and summer of 2015.

The first deal went off without a hitch. Lacy located a vehicle that met Dyer's requirements and sent Dyer an invoice. Dyer then wired funds to Lacy's account and picked up the vehicle in West Virginia.

The second deal started off smoothly but later fell through. Lacy again located a vehicle matching Dyer's requirements, and Dyer wired him funds to purchase the vehicle. Soon, however, Lacy informed Dyer that the deal could not be completed. But Lacy returned Dyer's funds when requested, so the interaction gave Dyer no cause for concern.

His trust in Lacy bolstered by the first two deals, Dyer agreed to a third deal in June 2015. That's when things went south. Through a series of text messages sent from Kentucky, Lacy told Dyer that he could obtain a Mercedes Benz GL450 for him and asked him to wire the necessary funds. Dyer told Lacy that he "need[ed] an invoice first." Lacy responded that he had already emailed Dyer a bill of sale.

The bill of sale, which was signed by Lacy, represented that Lacy's business was "the legal owner of the [Mercedes]" and had the "full right and authority to sell and transfer" the vehicle. After sending the bill of sale, Lacy pressed Dyer to wire him the funds. He told Dyer that he was "getting a check . . . cut to [the] dealership and [didn't] want delays." Dyer understood this to mean that Lacy was "paying for the vehicle to get it out of the dealership."

On June 10th, Dyer wired $80,410 from Tennessee to Lacy's bank account in Kentucky to purchase the Mercedes. A couple of days after wiring the funds, Dyer asked Lacy for an update on the Mercedes. Lacy responded that it should be available for pickup "today sometime or on Monday." When pushed for further updates, Lacy made excuses and changed the timeline. In a text message sent a week after wiring the funds, Dyer told Lacy that he would "need [his] money returned" if the deal had fallen through. Lacy assured Dyer that the deal would come together.

When Dyer inquired again a couple of days later—on Saturday, June 20th—Lacy responded that he was at the hospital with his aunt, who was "d[y]ing [of] cancer." Dyer expressed his condolences but told Lacy that he would "need [his] funds returned if the [Mercedes] isn't purchased Monday." He then sent another text demanding that Lacy return his funds "first thing tomorrow morning."

On Tuesday, June 23rd, when Dyer still had not received his funds and efforts to contact Lacy had been unsuccessful, he sent Lacy an email threatening legal action. Lacy responded that he had lost his phone at the beach. After Dyer made further demands that Lacy return his money, Lacy promised to send Dyer a portion of his funds the next day.

But Lacy never returned Dyer's money. Nor did he deliver the Mercedes. As it turned out, Lacy was not at the hospital with his dying aunt when Dyer asked for updates on the vehicle. He was in Myrtle Beach, South Carolina, with his fiancée, Leigh Ann Isaac, spending nearly $5,000 of Dyer's money. Although Lacy's bank records reflected thousands more in personal expenditures after Dyer wired him the funds for the car, there was no evidence that Lacy purchased the Mercedes or obtained title to the vehicle.

The Mercedes that was specified on the bill of sale was instead sold to Isaac at the end of June. Because some dealers in the high-end car industry refuse to sell to brokers or other dealers, it is common for middlemen like Lacy to use straw purchasers to buy the vehicles instead. Lacy said that Isaac was merely the straw purchaser for the Mercedes. But the title for the Mercedes was never reassigned to Lacy or Dyer, and neither Lacy nor Isaac ever delivered the vehicle to Dyer.

A Loudon County grand jury indicted Lacy for theft of property over $60,000 in violation of Tennessee Code Annotated section 39-14-103(a) (2014). Lacy moved to dismiss the indictment for lack of territorial jurisdiction, but the trial court denied the motion.

Lacy testified at trial but repeatedly changed his story. At first, he acknowledged negotiating with Dyer regarding the Mercedes and providing him with the bill of sale. On cross examination, he doubted whether he had personally sent all of the text messages to Dyer but remembered "doing the deal" for the "$80,410.00 purchase." By the end of his testimony, Lacy denied having any direct involvement in the Mercedes deal and claimed that he first learned of the transaction when he was arrested.

The jury convicted Lacy as charged. The trial court sentenced Lacy to ten years, with eleven months and twenty-nine days to be served in prison and nine years and one day on probation. The court also ordered Lacy to pay restitution.

Lacy moved for a new trial, arguing among other things that Tennessee lacked territorial jurisdiction and that the State had failed to prove that he obtained the funds without Dyer's effective consent. The trial court denied the motion for a new trial, and Lacy appealed.

The Court of Criminal Appeals affirmed Lacy's conviction. The court concluded that territorial jurisdiction existed under Tennessee Code Annotated section 39-11-103(b) (2014) because the crime was consummated in Tennessee. *See State v. Lacy*, No. E2022-01442-CCA-R3-CD, 2024 WL 4315008, at *5–6 (Tenn. Crim. App. Sept. 27, 2024). The court further held that Dyer's consent to send funds to Lacy was not effective because it was induced by deception. *Id.* at *4–5. We granted Lacy's application for permission to appeal. *See* Order, *State v. Lacy*, No. E2022-01442-SC-R11-CD, 2025 WL 588988, at *1 (Tenn. Feb. 21, 2025).

## II.

This appeal presents two issues. The first issue—whether the trial court had territorial jurisdiction—is a mixed question of law and fact. The interpretation of Tennessee's territorial jurisdiction statute and whether certain facts suffice to establish territorial jurisdiction are legal questions that we review de novo, with no presumption of correctness. *See State v. Payne*, 721 S.W.3d 204, 210 (Tenn. 2025) (explaining that jurisdictional determinations and questions of statutory interpretation are reviewed de novo). A jury's factual determinations regarding where certain events occurred are reviewed under a more deferential standard and must be upheld if "*any* rational trier of fact" could have reached that conclusion. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017); *see also State v. Legg*, 9 S.W.3d 111, 118 (Tenn. 1999).[1]

The second issue is whether sufficient evidence supports Lacy's theft conviction. A jury's guilty verdict shifts the burden to the defendant to overcome the "presumption of guilt." *Stephens*, 521 S.W.3d at 724. "[V]iewing the evidence in the light most favorable to the prosecution," we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021). When evaluating the evidence, we "accredit[] the testimony of the witnesses

---

[1] In the opinion below, the Court of Criminal Appeals said that "[t]erritorial jurisdiction is a question of fact for the jury and must be proven beyond a reasonable doubt." *Lacy*, 2024 WL 4315008, at *5 (citing *State v. Beall*, 729 S.W. 270, 271 (Tenn. Crim. App. 1986)). As explained, whether statutory territorial jurisdiction exists is not a pure question of fact, but rather a mixed question of law and fact. We also doubt whether the Court of Appeals' recitation of the burden of proof is correct given Tennessee Code Annotated section 39-11-201(f) (2014), which provides that jurisdiction in criminal cases need only be "proven by a preponderance of the evidence." We need not decide that issue here because the State prevails under either standard.

- 4 -

for the State and resolve[] all conflicts in favor of the prosecution's theory." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023).[2]

III.

Our analysis proceeds in two parts. We first consider whether the trial court had territorial jurisdiction under Tennessee Code Annotated section 39-11-103 (2014). We conclude that it did, because Lacy consummated the theft offense in Tennessee using direct electronic means. We then turn to Lacy's sufficiency-of-the-evidence challenge. We reject Lacy's argument that the State failed to prove Dyer's lack of consent; the evidence presented at trial established that Dyer's consent to transfer to the funds was obtained through deception and was therefore ineffective.

A.

1.

A court must possess three kinds of jurisdiction to exercise judicial power over a criminal prosecution: "jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." *Legg*, 9 S.W.3d at 114. Territorial jurisdiction concerns the State's power "to punish criminal conduct occurring within its borders." *Id.* A State's territorial jurisdiction springs from its sovereignty within its own territory. *See Simpson v. State*, 23 Tenn. (4 Hum.) 456, 462–63 (1844); *cf.* Joseph Story, *Commentaries on the Conflict of Laws* § 18 (1834) ("[E]very nation possesses an exclusive sovereignty and jurisdiction within its own territory."). Because a State's sovereignty extends only to its territorial boundaries, it generally may not exercise jurisdiction over criminal conduct that occurs entirely outside the State. *See, e.g.*, *Coffee v. Peterbilt of Nash., Inc.*, 795 S.W.2d 656, 658–59 (Tenn. 1990) ("A state's criminal law is of no force and effect beyond its territorial limits[.]"); *Legg*, 9 S.W.3d at 114; *Simpson*, 23 Tenn. at 463–65; *State v. Evans*, 1 Tenn. (1 Over.) 211, 220 (1806); *see also* Tenn. Const. art. I, § 31 (establishing Tennessee's geographic "limits and boundaries"); Story, *supra*, § 20 (1834) ("[N]o sovereign has a right to give the law beyond [its] own dominions . . . .").

Tennessee's territorial jurisdiction was originally governed by the common law. *See Legg*, 9 S.W.3d at 114; *Simpson*, 23 Tenn. at 459; *Riley v. State*, 28 Tenn. (9 Hum.) 646, 657 (1849). At common law, a State could punish a defendant "only if the conduct [took] place or the result happen[ed] within [the State's] territorial limits." Wayne R. LaFave et al., *Criminal Procedure* § 16.4(c) (4th ed. Nov. 2025) (collecting common-law territorial

---

[2] Lacy's brief raises two additional issues. But because those issues exceed the scope of our Rule 11 grant order, we do not address them. *See Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 537–41 (Tenn. 1998) (limiting review to the granted issues).

jurisdiction cases); *accord Legg*, 9 S.W.3d at 114 (explaining that Tennessee courts "required that the *locus in quo* of the crime occur within Tennessee"); *Evans*, 1 Tenn. at 220.

Over time, Tennessee courts extended common-law territorial jurisdiction to include situations in which the defendant was only *constructively* present in the State. *See Watson v. State*, 12 S.W.2d 375, 377 (Tenn. 1928); *Riley*, 28 Tenn. at 657–58. Under this framework, territorial jurisdiction existed because the defendant's criminal conduct effectively "carrie[d] the person" into the State. *Watson*, 12 S.W.2d at 377.

Tennessee's legislature eventually passed a statute that defined the State's criminal territorial jurisdiction. Enacted in 1858, that statute conferred territorial jurisdiction not only when the crime was wholly committed in Tennessee, but also when the crime started outside the State but was "consummated within [Tennessee's] boundaries." Code of Tenn. § 4973 (1858). This statute remained unchanged for over a century, until the legislature recodified it with minor amendments in 1989 at Tennessee Code Annotated section 39-11-103. *See Legg*, 9 S.W.3d at 114; Act of June 12, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169, 1170 (codified at Tenn. Code Ann. § 39-11-103).[3]

2.

Section 39-11-103 grants territorial jurisdiction over three categories of offenses: (1) offenses committed in Tennessee, unless exclusively within the jurisdiction of federal courts, Tenn. Code Ann. § 39-11-103(a); (2) offenses commenced outside of Tennessee but consummated within the State, unless otherwise provided by statute, *id.* § 39-11-103(b)(1); and (3) offenses commenced within Tennessee but consummated outside the State, *id.* § 39-11-103(c) (2014).

All agree that any crime that Lacy committed commenced in Kentucky rather than Tennessee. So this case involves only the second category of offenses—those commenced outside the State but consummated within the State. That category is governed by subsection 103(b).

Subsection 103(b)(1) provides that "[w]hen an offense is commenced outside of this state and consummated in this state, the person committing the offense is liable for punishment in this state in the county in which the offense was consummated, unless

---

[3] We have suggested that the common-law framework for territorial jurisdiction continues to apply, at least insofar as it is not expressly or impliedly abrogated by the statute. *See Legg*, 9 S.W.3d at 114 (noting that the 1858 statute "modified th[e] common law rule"); *Watson*, 12 S.W.2d at 377 (concluding that territorial jurisdiction statute "cover[ed] [the defendant's] case" but also relying on general principles of constructive presence). Because we conclude that the statute grants territorial jurisdiction in this case, we need not decide whether or to what extent the common-law framework remains in force.

- 6 -

otherwise provided by statute." *Id.* § 39-11-103(b)(1). A second provision—subsection 103(b)(2)—then forecloses certain objections that an out-of-state defendant might raise to statutory territorial jurisdiction. It provides that "[i]t is no defense that the person charged with the offense was outside of this state when the offense was consummated, if the person used . . . [a]n innocent or guilty agent; or . . . [o]ther means proceeding directly from the person" to consummate the crime. *Id.* § 39-11-103(b)(2). On its face, section 103(b)(2) is not an independent jurisdictional grant. Instead, it makes clear that a defendant need not be physically present in the State at the time of consummation if the defendant uses either an agent or other direct means to consummate the crime. *Id.* § 39-11-103(b)(2).

The parties dispute whether consummation of the offense in Tennessee is enough to create territorial jurisdiction if the defendant was outside the State at the time of consummation and *did not* use an agent or other direct means. The State argues that it is. In the State's view, subsection 103(b)(2) merely forecloses a common argument and should not be read to create an affirmative defense for out-of-state defendants who did not consummate the offense using an agent or other direct means. Lacy, on the other hand, contends that subsection 103(b)(2) defines necessary conditions for exercising territorial jurisdiction over a physically absent defendant.

We need not resolve that dispute to decide this case. Everyone agrees that—at a minimum—territorial jurisdiction exists under subsection 103(b)(1) when an out-of-state defendant consummates a crime in the State using either an agent or other means proceeding directly from his person. We therefore assume that Lacy's narrower reading of subsection 103(b)(2) is correct, without deciding that issue.[4]

3.

To prove territorial jurisdiction under Lacy's narrower reading of subsection 103(b)(2), the State must show that (1) Lacy consummated the theft offense in Tennessee and (2) did so using an agent or other direct means proceeding directly from his person. We consider each issue in turn, taking care to interpret the statutory language according to its "[o]riginal public meaning," *State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022), unless the legislature has provided a different definition, *Williams v. Smyrna Residential, LLC*, 685 S.W.3d 718, 723 (Tenn. 2024).

*Consummation*. Territorial jurisdiction exists under subsection 103(b)(1) when a crime "is consummated in this state." The term "consummate" means "[t]o bring to completion or fruition" or to "conclude." *Consummate*, The American Heritage Dictionary of the English Language 405 (3d ed. 1992); *see also Consummation*, Black's Law

---

[4] The State conceded at oral argument that we need not resolve this dispute if subsection 103(b)(2) is satisfied in this case.

Dictionary 318 (6th ed. 1990) (similar). Consistent with this understanding, we held in *Legg* that "in most cases" a defendant consummates a crime within the meaning of subsection 103(b)(1) when "the last element necessary for commission of the crime is satisfied"—that is, when "all the elements are met." 9 S.W.3d at 115.[5]

To determine when an offense was consummated, then, we must examine its elements. The State charged Lacy under Tennessee's generic theft statute, Tennessee Code Annotated section 39-14-103(a) (2014). Under that statute, "[a] person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* The State must prove three elements to convict a defendant of theft—the defendant (1) "knowingly obtaine[d] or exercise[d] control over the property," (2) did so "without the owner's effective consent," and (3) acted "with the intent to deprive the owner of property." Tenn. Code Ann. § 39-14-103(a); *accord State v. Gentry*, 538 S.W.3d 413, 422 (Tenn. 2017).

Ordinarily, the offense of theft will consummate—or become complete—when the defendant obtains or exercises control over the property after having already formed the intent to deprive the owner of the property and failed to secure the owner's consent. *See State v. Robinson*, No. W2022-00459-CCA-R3-CD, 2023 WL 2669906, *6 (Tenn. Crim. App. Mar. 9, 2023). This case follows that pattern. By the time Lacy instructed Dyer to wire him the funds for the Mercedes, Lacy had already provided Dyer with a bill of sale falsely stating that Dyer owned the vehicle and plainly intended to keep Dyer's money. The theft here was consummated when Lacy obtained or exercised control over the property.

The critical question under subsection 103(b)(1) is whether Lacy obtained or exercised control over Dyer's property *in Tennessee*. The term "obtain," as used in Title 39, is statutorily defined. "When the statute itself defines a term, . . . we must follow that definition even if it differs from the term's ordinary meaning." *Williams*, 685 S.W.3d at

---

[5] *Legg* held that "this general rule does not invariably follow in cases of continuing offenses." 9 S.W.3d at 115. When an offense is continuing in nature, "the offense is deemed to have both commenced and consummated anew in Tennessee so long as any essential element to the offense continues to be present in Tennessee." *Id.* at 116. But that continuing offense test does not apply here because statutory theft is a non-continuing offense. *See State v. Robinson*, No. W2022-00459-CCA-R3-CD, 2023 WL 2669906, *6 (Tenn. Crim. App. Mar. 9, 2023). We determine whether an offense is continuing by "look[ing] to the statutory elements of the offense" and asking "whether the elements of the crime themselves contemplate a continuing course of conduct." *Legg*, 9 S.W.3d at 116; *see also State v. Adams*, 24 S.W.3d 289, 295 (Tenn. 2000) (explaining that an offense is continuing "only when 'the explicit language of the substantive criminal statute compels such a conclusion'" (quoting *Legg*, 9 S.W.3d at 116)); *State v. Hoxie*, 963 S.W.2d 737, 742 (Tenn. 1998) (examining statutory elements to determine whether an offense was continuing). The statutory elements of theft in Tennessee Code Annotated section 39-14-103(a) do not contemplate a continuing course of conduct. *See Robinson*, 2023 WL 2669906, at *7 (explaining that the theft was complete when the defendant's conduct satisfied the statutory elements).

- 8 -

723. As defined by the legislature, "obtain" "means to . . . [b]ring about a transfer or purported transfer of property or of a legally recognized interest in the property, whether to the defendant or another." Tenn. Code Ann. § 39-11-106(a)(24)(A)(i) (2014).

Applying this definition, Lacy consummated the theft when he obtained Dyer's funds by bringing about their transfer. The record shows that Lacy brought about the transfer when Dyer followed his instructions to wire over $80,000 from his office in Lenoir City, Tennessee, to Lacy's Kentucky bank account to purchase the Mercedes. The theft was therefore consummated in Tennessee.

Lacy argues that he did not obtain Dyer's funds until they were under his control. And in his view, the funds were not under his control until they hit his Kentucky bank account. But that cramped understanding of what it means to "obtain" property cannot be reconciled with the statutory definition of that term. The legislature has provided that a defendant can "obtain" property merely by "[b]ring[ing] about [its] transfer . . . *whether to the defendant or another*." Tenn. Code Ann. § 39-11-106(a)(24)(A)(i) (emphasis added).[6] If the defendant can obtain property by transferring it to another, then he obviously need not control the property to commit theft. Indeed, "exercis[ing] control" over the property is an alternative way that a defendant can commit theft. *Id.* § 39-14-103(a) ("A person commits theft of property if . . . the person knowingly obtains *or exercises control over* the property . . . ." (emphasis added)). It is not the only way. Here, Lacy consummated the theft offense when he brought about the transfer of Dyer's property in Tennessee.

*Other Means*. The State argues that "it is no defense" that Lacy was not physically present in Tennessee when the offense was consummated because Lacy used "[o]ther means proceeding directly from [his] person" to commit the theft offense. Tenn. Code Ann. § 39-11-103(b)(2). We agree.

Lacy brought about the transfer of Dyer's property through a series of text messages, emails, and calls. The phrase "other means" is broad enough to include these electronic communications. Dictionaries define the term "means" as a "course of action or instrument by which" something can be accomplished or achieved. *Means*, The American Heritage Dictionary of the English Language 1116 (3d ed. 1996); *see also Means*, Black's Law Dictionary 980 (6th ed. 1990). The adjective "other" makes clear that the means used in subsection 103(b)(2)(B) must be "[d]ifferent or distinct from [those] already mentioned"

---

[6] In *State v. Odom*, the Court of Criminal Appeals stated that the "crime of theft" requires the "actual receipt of property or services." 64 S.W.3d 370, 374 (Tenn. Crim. App. 2001); *see also State v. Lyons*, 669 S.W.3d 775, 789 (Tenn. 2023). But *Odom* made that statement only to distinguish theft from the crimes of forgery and criminal simulation, which "do not require actual receipt of property or services." *Id.* at 374. The court did not examine the statutory definition of "obtain" or purport to identify all of the circumstances in which that element of theft will be satisfied. *Odom* therefore provides no support for Lacy's argument.

in subsection 103(b)(2)(A). *Other*, Black's Law Dictionary 1101 (6th ed. 1990). Subsection 103(b)(2)(A) concerns the use of "[a]n innocent or guilty agent." Tenn. Code Ann. § 39-11-103(b)(2)(A). As used in subsection 103(a)(2)(B), the phrase "other means" refers to a course of action or instrument other than the use of an agent. The electronic communications Lacy used to bring about the transfer of Dyer's funds easily fit within this broad definition.

The "other means" used must also "proceed[] directly from the person." *Id.* Lacy's electronic communications meet this requirement too. The term "proceed" means "[t]o begin or carry on an action or a process" or "[t]o come from a source; originate or issue." *Proceed*, The American Heritage Dictionary of the English Language 1444 (3d ed. 1996). And "directly" means "without anyone or anything intervening." *Directly*, The American Heritage Dictionary of the English Language 527 (3d ed. 1996). Thus, means proceeding directly from the person include actions the defendant personally initiates or undertakes or instruments the defendant personally employs to accomplish or achieve a result.

The record in this case is replete with text messages and emails sent from Lacy's accounts that caused Dyer to wire funds to Lacy. Lacy denied personally sending these communications or instructing anyone to send them when he testified at trial. But the jury was free to discredit that testimony and likely did so given Lacy's shifting accounts of what had transpired. *See State v. Rimmel*, 710 S.W.3d 640, 648 (Tenn. 2025).

That the means employed in this case were electronic rather than physical is no reason to exclude them from subsection 103(b)(2)(B). As discussed, the plain meaning of "other means proceeding directly from the person" is broad enough to include electronic communications. Electronic communications were already in existence when the legislature enacted the current version of the territorial jurisdiction statute in 1989, albeit not as widespread. *See Timeline of Computer History*, Comput. Hist. Museum (Mar. 13, 2026, 3:33 PM), https://perma.cc/9554-AQRQ. But even if these technologies had developed later, that would not prevent us from reading the phrase "other means" to cover new conduct. When the legislature uses broad language like "other means," we can apply that language "to technology unknown when the operative words took effect." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 86–87 (2012); *see also id.* ("Broad language can encompass the onward march of science and technology[.]"); *Browder v. United States*, 312 U.S. 335, 339–40 (1941) ("While a statute speaks from its enactment, even a criminal statute embraces everything which subsequently falls within its scope.").

\*     \*     \*

In sum, although Lacy was not physically present in Tennessee when the conduct forming the basis of the State's theft prosecution occurred, he consummated the theft in

- 10 -

Tennessee by bringing about Dyer's transfer of funds from Tennessee to Kentucky. And he accomplished that result through "other means proceeding directly from the person" when he convinced Dyer through a series of text messages, emails, and phone calls to part with his funds. The State therefore met its burden of establishing statutory territorial jurisdiction under section 13-11-103(b).

B.

Finally, we turn to Lacy's sufficiency-of-the-evidence challenge. Recall that the State must prove three elements to convict someone of theft—that the defendant (1) "knowingly obtaine[d] or exercise[d] control over the property," (2) did so "without the owner's effective consent," and (3) acted "with the intent to deprive the owner of property." Tenn. Code Ann. § 39-14-103(a); *accord Gentry*, 538 S.W.3d at 422. Lacy contends that the evidence was insufficient to prove the second element—a lack of effective consent. We disagree.

Tennessee's theft statute makes it a crime to take another's property "without effective consent." Tenn. Code Ann. § 39-14-103(a). The legislature has defined "effective consent" to mean "assent in fact, whether express or apparent, including assent by one legally authorized to act for another." Tenn. Code Ann. § 39-11-106(a)(9) (2014). "Consent is not effective," however, when it is "induced by deception or coercion." *Id.* Put another way, consent obtained by deception is always ineffective.

The term "deception" is also statutorily defined. *See id.* § 39-11-106(a)(6)(A) (2014). Deception can occur in a few ways. *Id.* Relevant here, a person engages in deception when he "knowingly . . . [p]romises performance that at the time the person knew the person did not have the ability to perform or that the person does not intend to perform or knows will not be performed." *Id.* § 39-11-106(a)(6)(A)(vi)(*a*). Deception also includes "knowingly . . . [c]reat[ing] or reinforc[ing] a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true." *Id.* § 39-11-106(a)(7)(A)(i) (2014).

It follows from these definitions that a person's consent is ineffective if it is induced through a promise that the promisor knew he could not perform or did not intend to perform, or through words or conduct that created a false impression. A rational juror easily could have concluded from the evidence presented at trial that Dyer's consent was ineffective within the meaning of the statute. Dyer wired $80,410 to Lacy because he believed, based on Lacy's representations, that Lacy was going to use those funds to purchase a Mercedes Benz GL450 that would then be transferred to Dyer. In reality, Lacy had made a promise that he either could not perform or had no intention of carrying out. Instead of using Dyer's money to purchase the Mercedes as promised, he treated himself and his fiancée to a beach vacation. The bill of sale that Lacy sent to Dyer stated that he

- 11 -

owned the Mercedes and had "full right and authority to sell and transfer" it to Dyer. But that was false. Lacy never owned the Mercedes and had no authority to sell it to Dyer. In short, the record here establishes that Lacy obtained Dyer's money without his effective consent.

Lacy urges us to require the State to prove an additional element—a "fiduciary breach"—because the theft arose in a commercial context. But that argument fails twice over.

*First*, and most importantly, the theft statute contains no such requirement. *See* Tenn. Code Ann. § 39-14-103(a); *Gentry*, 538 S.W.3d at 422. Tennessee's theft statute requires the State to prove three elements and only three elements, regardless of the context in which the theft arose. Tenn. Code Ann. § 39-14-103(a). This Court cannot superimpose a fourth element because we are "without power to read [words] into the statute which the Legislature did not" enact. *State v. Davidson*, 184 S.W. 18, 19 (Tenn. 1916). We may only "declare the law as it is," *Bramlet v. Bates*, 33 Tenn. 554, 573 (1853), not prescribe what it ought to be, *Watson v. Hoge*, 15 Tenn. 344, 353 (1835). *See also Franklin v. Armfield*, 34 Tenn. 305, 346 (1854) ("It is the business of the judiciary to ascertain and declare what is the law of the land in a case submitted, and not to make a new law.").

*Second*, the case that Lacy cites as support for this atextual fourth element does not require the State to prove a breach of fiduciary duty. Lacy cites *State v. Amanns*, 2 S.W.3d 241 (Tenn. Crim. App. 1999), a Court of Criminal Appeals decision that does not bind this Court. In that case, the State had chosen to prosecute the defendant for theft "under a theory of fraudulent breach of trust." *Id.* at 244. The court held that the mere existence of a contract between the parties did not establish the existence of a fiduciary relationship and that the proof therefore did "not support the crime of fraudulent breach of trust." *Id.* But the court also considered whether the State had established the three elements required to convict a defendant under the general theft statute and concluded that it had not. *Id.* at 244–45. Far from supporting Lacy's argument, *Amanns* makes clear that the State need only prove three elements to convict a defendant under section 39-14-103.

Because the State proved these three elements by sufficient evidence in this case, we affirm Lacy's theft conviction.

- 12 -

**CONCLUSION**

We hold that Lacy was subject to Tennessee's territorial jurisdiction under Tennessee Code Annotated section 39-11-103(b) and that the evidence was sufficient to support Lacy's theft conviction. We therefore affirm the judgment of the Court of Criminal Appeals.

_____
SARAH K. CAMPBELL, JUSTICE